IN THE UNITED STATES BANKRUPTCY COURT FOR THE
WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| HOUSE OF LLOYD, SALES LLC, *et al.*, | ) | Case No. 02-40208 |
| | ) | Jointly Administered |
| Debtors. | ) | |
| ——————————————— | ) | |
| | ) | |
| JANICE E. STANTON, TRUSTEE, | ) | Adversary No. 05-4014 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SGC PARTNERS I, LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| ——————————————— | ) | |
| | ) | |
| JANICE E. STANTON, TRUSTEE, | ) | Adversary No. 06-4283 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| COWEN AND COMPANY, LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**<u>MEMORANDUM OPINION</u>**

This is a core proceeding under 28 U.S.C. § 157(b)(2) over which the Court has

jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 157(a), and 157(b)(1).  For reasons to be

stated, I will enter an order granting summary judgment in favor of the Defendants as to

Counts I, II and III of the Third Amended Consolidated Complaint,[1] and denying the

Trustee's motion for summary judgment.

## I.  FACTUAL BACKGROUND

### A.  General Background as to House of Lloyd

House of Lloyd was a privately held direct sales company founded in 1947 by the late

Harry Lloyd.  It focused on the sales of Christmas decorations, giftware, and cookware

utilizing what is known as the party plan sales method.  Revenue was generated by a sales

force consisting of individuals who held parties in their homes to sell the products. Since its

business was focused on the Christmas season, approximately seventy-five to eighty percent

of its income was earned during the last four months of any given year.[2]

This bankruptcy case was filed on behalf of the House of Lloyd companies as a

Chapter 11 on January 14, 2002, and was converted to a Chapter 7 liquidation on September

19, 2003, with Plaintiff Janice Stanton being appointed as Chapter 7 trustee.  For more than

a decade prior to the bankruptcy filing, sales at House of Lloyd had been steeply declining,

---

[1]  Defendants' Motion for Summary Judgment requested summary judgment on Counts I and II, but did not request summary judgment as to Count III.  However, the Trustee's Motion for Summary Judgment and Suggestions in Support did, and the Defendants responded to her Motion by requesting that Count III be dismissed, and pointing out that summary judgment may be granted for a non-moving defendant where there is no genuine issue of material fact.  *See* Defendants' Joint Reply Suggestions in Further Support of Their Motion for Summary Judgment and in Opposition to the Trustee's Motion for Summary Judgment (Doc. #176) at p. 40, n.25 (*citing Townes v. City of St. Louis*, 949 F.Supp. 731, 734 (E.D. Mo. 1996)). In any event, I will treat the Defendants' response as a request for summary judgment as to Count III as well.

[2]  Joint Statement of Facts (Doc. #199), *Undisputed Facts for Purposes of Summary Judgment* (hereafter, "Joint Statement - Undisputed Facts") ¶¶ 29 and 30.

from approximately $400 million in 1988 to $166 million in 1998.[3]  The decline in sales is further reflected in a decline in the number of sales people, since they were the ones who held the home parties that generated sales.  That number declined from over 60,000 in 1994 to 37,000 in 1998.[4]

In addition, the company had experienced a similar decline in its earnings before interest, taxes, depreciation, and amortization (EBITDA), from $25.4 million in 1994 to $11.1 million in 1998.[5]  In part, this decline is explained by the decline in the sales force and total sales.  In addition, the company was harmed by the fact that it had overbuilt its two warehouse and office facilities, which consisted of approximately 1.6 million square feet and 85 acres of unoccupied land.[6]  These warehouses included an automatic picking operation used by the company's employees in picking and packing items which had been ordered by sales agents in connection with parties held in their homes.[7]  While the company's sales declined, it was still required to maintain those properties, which were not being used to full capacity.  The overhead expenses associated with the underutilized facilities continued to be a drag on the company's earnings as sales fell off.[8]

---

[3]  Joint Statement - Undisputed Facts ¶ 31.

[4]  *Id.*; Expert Report by Laureen M. Ryan dated September 5, 2007 (Doc. #133) (hereinafter, "Ryan Report") at 5.

[5]  Joint Statement - Undisputed Facts ¶ 31

[6]  Joint Statement - Undisputed Facts ¶ 34.

[7]  Joint Statement - Undisputed Facts ¶ 36.

[8]  Ryan Report (Doc. #133) at 5-6.

In January 1997, upon the death of Mr. Lloyd, his family trust assumed control of the company, which was then run primarily by his daughter. She did not intend to expand or improve the business, but instead looked to sell it.  The company was put up for sale in 1998.[9]

In the fall of 1999, Joel Kier, Managing Partner of Kier Group Holdings LLC (the "Kier Group"), which specialized in the acquisition and turnaround of consumer product companies, approached SG Capital Partners LLC ("SGCP") to co-invest in House of Lloyd.[10] Mr. Kier was interested in the traditional business of the company, namely, the direct sales business.  SGCP was interested in investing in companies which would provide support to other companies selling products on the internet.[11]  The Kier Group and SGCP ultimately did purchase House of Lloyd's assets in late 1999, with the intention of achieving both their objectives.

Subsequent to the purchase, Mr. Kier was placed in charge of the direct sales business. At his request, House of Lloyd retained Cloward, Moore and Tefft LLC ("CMT") to do a strategic assessment of the company.  That firm confirmed that the company was in a state of decline, that its name was not well branded, and that it was hurt by the seasonality of its sales, its disjointed marketing efforts, and its non-focused communications processes. The assessment further stated that the business had failed to maintain a strong sense of purpose

---

[9]  Joint Statement - Undisputed Facts ¶ 32.

[10]  Joint Statement - Undisputed Facts ¶¶ 38, 40.

[11]  Joint Statement - Undisputed Facts ¶ 39.

4

or vision, and that the warehousing, pick and pack and general fulfillment systems were severely underutilized.[12]  To fix these problems, and thereby improve sale prospects, CMT recommended that House of Lloyd revise the plan for compensating sales agents, get a new CEO, and relaunch the business with visionary leadership, substantial investment and from 18 months to three years to achieve momentum.[13]  According to CMT, this process would "likely be analogous to chemotherapy."[14]  Mr. Kier developed a plan for the direct sales business based, at least in part, on the recommendations of CMT.

The Defendants are individuals or entities connected to SGCP.  After being contacted by Kier, the Defendants' consultants confirmed that House of Lloyd's existing business model could be revamped and restored to profitability.  In addition, however, SGCP was interested in finding a use for the empty warehouse space.  Therefore, its due diligence included the possibility of also performing fulfillment services for third parties.  In other words, if other companies, particularly internet-based, e-commerce companies, needed someone to store, pick, and pack their inventory for shipment to customers, the theory was that House of Lloyd could do so for a fee and thereby make use of the equipment and

---

[12] House of Lloyd Direct Selling Business Strategic Assessment Prepared by Cloward, Moore & Tefft LLC dated May 2000 (the "CMT Report"), found at Plaintiff's Summary Judgment Exhibits (hereafter, "Trustee's Ex.") 61 at 5-8.

[13] *Id.*

[14] Joint Statement of Facts (Doc #199), *Disputed Facts - Facts Asserted in the Trustee's Statement of Facts and Additional Statement of Facts, and Defendants' Responses* (hereafter, "Joint Statement - Trustee's Statement of Fact") ¶ 20 at p. 49; *see also* the CMT Report, Trustee's Ex.61 at 2.

5

warehouse space which was then idle.  The potential upside of the e-fulfillment business was a critical factor in the decision of SGCP to go ahead with the investment.[15]  This would no doubt require an investment in technology, something that House of Lloyd had essentially ignored throughout the entire 1990's.[16]  Therefore, it was anticipated that the upgrade in technology would benefit not only the new venture into e-commerce but, eventually the existing direct sales business as well.  This was a period of time in which e-commerce was beginning to grow, and SGCP's consultants advised it that the then-anticipated explosive growth in such transactions would create a viable opportunity to utilize the company's existing assets in this fashion.

As discussed more fully below, things did not turn out so well for House of Lloyd, either with the existing direct sales business, or the new e-commerce venture, and it ultimately filed for bankruptcy protection.  The crux of the Trustee's complaint here is that the Defendants breached fiduciary duties to the Debtor companies by either choosing to go into the third party e-fulfillment business,  not waiting until the existing direct sales business had been turned around to do so, or not spending enough money to make the new business

---

[15]  Statement of Uncontroverted Material Facts in Support of Defendants' Motion for Summary Judgment, attached as Exhibit A to Defendants Joint Suggestions in Support of Their Motion for Summary Judgment (Doc. #149) (hereafter, "Defendants' 56.1 Stmt.") ¶ 39.

[16]  Deposition of Elizabeth J. Palm (hereafter, the "Palm Deposition") found in the Exhibits to Defendants' 56.1 Stmt. (hereafter, "Defendants' 56.1 Stmt. Ex.") 32 at 415.  (Note that portions of the Palm Deposition are also found at Defendants' Exhibits to Defendants' Response to Trustee's Statement of Undisputed Material Facts (hereafter "Defendants' Supp. Ex.") 2.) *See also*, Deposition of Moritz Schlenzig (hereafter "Schlenzig Tr.") found at Defendants' 56.1 Stmt. Ex. 38 at 184.

6

a success.

## B.  The Purchase of House of Lloyd's Assets

On November 17, 1999, SGCP and the Kier Group purchased House of Lloyd from the Harry J. Lloyd Charitable Family Trust, (the "Lloyd Trust") for a total of $52.5 million, with SGCP investing $18 million cash, and the Kier Group investing an additional $2 million.[17]  In connection with this purchase, SGCP and the Kier Group created a parent company, House of Lloyd Management, LLC ("HOL Management"), which was the holding company of six subsidiaries:  House of Lloyd Sales, LLC ("HOL Sales"), House of Lloyd Properties, LLC ("HOL Properties"), House of Lloyd Catalogues, LLC ("HOL Catalogues"), House of Lloyd Retail, LLC ("HOL Retail"), House of Lloyd Colorado, LLC, and House of Lloyd Member, LLC (collectively, the "Subsidiaries").[18]  HOL Sales was the subsidiary charged with running the traditional direct sales side of the business.

At the time of the closing of the sale, PNC National Bank provided a revolver and term loan totaling $67.5 million for the acquisition, based on a plan that included both the turnaround of the direct sales business and development of the e-fulfillment business. Indeed, the PNC loan documents themselves specifically reference the possibility of adding the third-party fulfillment services, by defining the Debtors' business to include the existing business, and also "the development or implementation of fulfillment services for third

---

[17]  Joint Statement - Undisputed Facts ¶¶ 58-59, 62; Third Amended Consolidated Complaint (Doc. #120) ¶ 21.

[18]  Joint Statement - Undisputed Facts ¶ 56.

parties, including the fulfillment or tracking of customer orders, shipping and delivering for such third parties, now or hereafter engaged in by Borrower (the "Fulfillment Business")."[19] At the closing of the sale, the Lloyd Trust carried back a debt of $15 million, secured by a lien junior to that of PNC.[20]

The loan documents with PNC and the Lloyd Charitable Trust identify four of the House of Lloyd subsidiaries as borrowers: HOL Sales, HOL Properties, HOL Catalogues, and HOL Retail.[21]  HOL Management, the parent company, guaranteed the obligations.[22] Collateral for the loans included all receivables, equipment, intangibles, inventory, investment property, real property and leasehold interests of all such borrowers.[23]  Most of the fixed assets, including the warehouse facilities, were allocated to HOL Properties.[24] However, as a practical matter, the success of each of those companies was tied to the operations of the whole entity, since the debts to PNC and the Lloyd Family Trust were secured by all their assets.

### C. Operation of House of Lloyd by the Defendants

---

[19]  Joint Statement - Undisputed Facts ¶¶ 75, 76.

[20]  The House of Lloyd company had been owned by various entities connected to Mr. Lloyd, which were the original obligees on the note. However, by the time of the bankruptcy, these entities had assigned their interests to the Lloyd Trust.

[21]  Joint Statement - Undisputed Facts ¶ 72.

[22]  *Id.*

[23]  Joint Statement - Undisputed Facts ¶ 73.

[24]  Joint Statement - Undisputed Facts ¶ 68; Ryan Report (Doc. #133) at 8.

The company's sales had continued to decline in 1999, to $139 million. Nevertheless, at the end of that year, the company had $37.3 million in cash on its balance sheet, and $21 million in inventory. However, by the end of 1999, there is no dispute that the company was in a long-term period of decline, and that significant changes needed to be made to turn it around. That decline continued in 2000, with sales dropping further to $125.2 million.[25] For the year, the Third Amended Complaint alleges that the company had a net loss of $11,163,939.[26] Nevertheless, at year-end the company still had in excess of $30 million in cash.[27]

Immediately following the purchase of HOL, Joel Kier became acting CEO of HOL Sales, which, as stated above, was the subsidiary that operated the direct sales side of the business. In March 2000, in accordance with the CMT Report (which recommended that the company hire a new CEO and engage in a strategy to radically transform the existing direct sales business), HOL representatives met with Betty Palm, who had been President of Tupperware North America beginning in 1998 and extending into 2000.[28] It was immediately evident to Palm that HOL needed to make some use of its excess warehouse

---

[25]  Joint Statement - Undisputed Facts ¶ 126; Palm Deposition (Defendants' 56.1 Stmt. Ex. 32) at 177.

[26] Third Amended Complaint ¶ 29.

[27]  Palm Deposition (Defendants' 56.1 Stmt. Ex. 32) at 235-36.

[28]  Palm Deposition (Defendants' 56.1 Stmt. Ex. 32) at 78-9.

facilities,[29] that its technology was antiquated,[30] and that it was not a dynamic, growing company.[31]

Palm joined the company as Chief Operating Officer on June 6, 2000, and was charged with revitalizing the existing business, as opposed to the e-commerce fulfillment proposal.[32] She immediately set about to develop a new compensation and marketing plan to be announced at a meeting of the sales force in Nashville in January 2001, and to be implemented beginning in the fall of 2001.[33] At that meeting, she testified that she had an "aha" moment, in which she realized the depth of the company's problems.[34] That was because she saw that the sales force was much older than those at other companies her management team had worked with, and that the task of revitalizing that sales force would be much more difficult than she had previously realized.[35] Nevertheless, she stayed with the company and proceeded with her plan. According to her testimony, she was given every resource necessary in terms of hiring a management team, and in terms of implementing her

---

[29] Palm Deposition (Defendants' 56.1 Stmt. Ex. 32) at 109.

[30] Palm Deposition (Defendants' 56.1 Stmt. Ex. 32) at 238-39.

[31] Palm Deposition (Defendants' 56.1 Stmt. Ex. 32) at 105-06.

[32] Palm Deposition (Defendants' 56.1 Stmt. Ex. 32) at 107.

[33] Palm Deposition (Defendants' 56.1 Stmt. Ex. 32) at 219-20.

[34] Palm Deposition (Defendants' 56.1 Stmt. Ex. 32) at 286.

[35] Palm Deposition (Defendants' 56.1 Stmt. Ex. 32) at 287.

plan.[36]

Meanwhile, the Defendants continued to do due diligence as to the e-commerce venture. As stated, the Trustee contends either that such due diligence was inadequate, or that such venture should have waited until Palm had had ample opportunity to turn the existing direct sales business around. And, the Trustee contends that the investment in the e-commerce venture drained resources from the existing sales business, and thereby caused the demise of the company. The new venture, to be known as Dotdeliver, was approved by HOL Management's Board of Directors on June 6, 2000. In 2000, approximately $6.7 million was spent on Dotdeliver,[37] a year in which the company still, according to Palm, ended with over $30 million cash on hand.[38] For the year 2000, HOL's gross sales from the direct sales business dropped to $125.2 million.[39] The Defendants shut down Dotdeliver on or about June 1, 2001, before it had ever become an operating entity. In the meantime, the dot-com bubble had burst,[40] meaning that many of the startup companies which might have been expected to use the services of Dotdeliver to store, pick, and pack products they anticipated selling online, were unable to raise the capital they needed to operate. After June

---

[36] Palm Deposition (Defendants' Supp. Ex. 2.) at 177; Palm Deposition (Defendants' 56.1 Stmt. Ex. 32) at 120.

[37] Joint Statement - Undisputed Facts ¶¶ 141, 143.

[38] Palm Deposition (Defendants' 56.1 Stmt. Ex. 32) at 235-36.

[39] Joint Statement - Undisputed Facts ¶ 126.

[40] Third Amended Complaint (Doc. # 120) ¶ 31.

2001, approximately $381,000 was spent in connection with obligations relating to Dotdeliver.[41]

While no fault of Palm, the existing direct sales business continued to deteriorate in 2001.  Palm testified that by September of that year, many of the sales agents had not returned.[42]  Indeed, in November 2001, the company reported to PNC that its sales force had shrunk to 11,907, and that roughly half of them had not activated their Christmas seasonal selling cycle, and were disengaged.[43]  Not surprisingly, sales dropped even further for 2001, to $82 million.[44]  The Chapter 11 case was commenced shortly thereafter, on January 14, 2002.  Upon liquidation of their collateral, PNC was paid approximately $10 million,[45] and the Lloyd Trust received nothing on its junior lien.  They both, therefore, hold unsecured claims.

## II.  GENERAL ALLEGATIONS OF THE THIRD AMENDED COMPLAINT

Janice E. Stanton filed the Complaint against the Defendants in her capacity as Trustee for HOL Sales; HOL Catalogues; HOL Retail; HOL Properties; HOL Management; House of Lloyd Canada, LLC; HOL Colorado, LLC; and HOL Member, LLC, whose

---

[41]  Joint Statement - Undisputed Facts ¶ 140.

[42]  Palm Deposition (Defendants' 56.1 Stmt. Ex. 32) at 344-45.

[43]  Joint Statement - Undisputed Facts ¶ 153; *see also* Ryan Report (Doc. #133) at 14-15.

[44]  Joint Statement - Undisputed Facts ¶¶ 154, 155; *see also* Ryan Report (Doc. #133) at 10.

[45]  Joint Statement - Undisputed Facts ¶ 165.

bankruptcy cases are being jointly administered.   The Trustee contends in her Third

Amended Consolidated Complaint ("the Complaint")[46] that the Defendants were in control

of HOL,[47] and that they committed HOL to a course of financial ruin by launching a course

of conduct "designed to implement their plan to develop an e-fulfillment business regardless

of the impact of their plan" on the traditional House of Lloyd business.[48]  In particular, the

Complaint contends that the Defendants engaged in "willful and wanton and/or grossly

negligent conduct" in failing to conduct a reasonable investigation of the new e-commerce

venture, and in diverting "millions" of dollars to such venture at a time when such funds were

needed in HOL Sales.[49]  The underlying theme of the case is that the Defendants acted with

reckless indifference to the fate of HOL Sales, that they simply intended to use its

warehouses, equipment, and personnel to build an e-commerce business, and that they let

HOL Sales die because their real interest was in the new venture.[50]

Counts I and II, as to which the parties Defendants seek summary judgment here, ask

---

[46]  Doc. #120.

[47]  I previously held that to the extent any of the Defendants were in control of HOL, they would be subject to the same fiduciary obligations as an officer or director.  *See* Order Granting Motion to Dismiss Count IX of Complaint in Adversary No. 06-04283, and in all Other Respects Denying Motion to Dismiss Such Complaint (Doc. #112).  However, since I hold that no fiduciary obligations were violated here, I need not determine which of the Defendants were in control of HOL.

[48]  Third Amended Complaint ¶ 22.

[49]  Third Amended Complaint ¶ 78.

[50]  Transcript of Hearing on Motions for Summary Judgment held February 8, 2008 (hereafter, "Feb. 8, 2008 Tr.") at 5.

for damages of at least $26.5 million for breach of fiduciary duty in proceeding with Dotdeliver, and in incurring "catastrophic" debt as a result.  As will be seen, however, there is overwhelming evidence that the Defendants fully complied with their fiduciary duties in making the decision to proceed with Dotdeliver.  Both before and after acquiring HOL, the Defendants retained experts, did research, and extensively discussed and considered the feasibility of the new venture.  There is also overwhelming evidence that they made extensive efforts to revive HOL Sales' direct sales business and certainly did not act with reckless indifference to its fate, which was directly tied to their own. Faced with this evidence, counsel for the Trustee contended in the alternative at oral argument that the Dotdeliver investment could have been a viable one, but that they "not be in such a rush, don't try and spend all this money at once, take a cautious approach."[51]  In other words, the venture might have worked, but the Defendants should have taken a more cautious approach.

Count III of the Complaint, which is also part of the pending motions for summary judgment, contends that the Defendants paid themselves management fees in breach of their fiduciary duties.[52]  In addition, the Complaint seeks to set aside payment of such fees on several grounds (Counts IV, V, IX, X, XI, and XII) which are not the subject of the pending motions for summary judgment.[53]

---

[51]  Feb. 8, 2008 Tr. at 20.

[52]  Third Amended Complaint ¶ 53.

[53]  The Trustee previously dismissed Count VI.  *See* Order of the Court Granting Trustee's Motion to Dismiss Count VI - Breach of Fiduciary Duties - Failure to Maintain Directors and Officers Insurance - Without Prejudice (Doc. #172).  On March 12, 2008, the Trustee moved to

## III.  DEFENSES RAISED BY THE DEFENDANTS

The Defendants[54] are, or were at the time, all associated with Société Générale, one

of the largest banks in the world.  The Defendants' main defense is that their actions are

protected by Delaware's business judgment rule.  As will be explained in detail, I find that

the business judgment rule applies, and that the Trustee has failed to overcome the

presumption that the Defendants acted on an informed basis, in good faith, and in the honest

belief that the actions taken were in the best interests of the various companies involved.

The Defendants raise various other defenses besides the business judgment rule.  For

example, they argue that, to the extent they owed fiduciary duties to the Debtors, they are

protected from liability by Section 18-406 of the Delaware Limited Liability Company Act,[55]

which protects managers or members who rely in good faith on information, opinions,

reports, or statements of professionals or experts, and also by the exculpation clause in the

House of Lloyd Sales Sub Operating Agreements, which protects the "managing member,"

HOL Management, from liability for "any breach of duty."[56]  The Defendants also argue that

they did not owe any fiduciary duties to the unsecured creditors as a whole, whose interests

---

dismiss Counts VII and VIII.  That motion will be granted by separate Order.

[54]  The named Defendants in this adversary proceeding are: SGC Partners I, LLC; SGC
Partners II, LLC; SG Merchant Banking Fund, LP; SG Capital Partners, LLC; John Driscoll;
James Lane; Christopher Neenan; Eric Von Stroh; Frank Pottow; Cowen Capital Partners, LLC;
Cowen and Company, LLC; and SG Americas Securities, LLC.

[55]  6 Del. Code Ann. tit. 6, § 18-406.

[56]  Joint Statement - Undisputed Facts ¶¶ 64, 65.

15

are represented by the Trustee, until such time as the Debtors became insolvent.  And, Defendants Pottow and Von Stroh argue that they individually did not owe any fiduciary duties until they in fact joined HOL Management's Board of Directors, which was more than a year after the Board had decided to go ahead with the e-commerce venture, and after virtually all funds had been spent on such venture.

However, since I find that the business judgment rule protects all of the Defendants from liability to the Trustee under Counts I, II, and III of the Complaint, I need not reach these or other defenses raised by the Defendants.

### IV.  STANDARDS FOR SUMMARY JUDGMENT MOTIONS

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[57]  The burden on the moving party "is only to demonstrate . . . that the record does not disclose a genuine dispute on a material fact."[58]  The non-moving party then must set forth specific facts showing a genuine issue of material fact for trial.[59]

### V.  APPLICABLE LAW AS TO BREACH OF FIDUCIARY DUTIES

Delaware, as other states, encourages individuals to invest in businesses, and to serve as officers and directors, by providing for limited liability.  In keeping with that premise, the

---

[57]  Fed. R. Civ. P. 56(c).

[58]  *City of Mt. Pleasant, Iowa v. Assoc. Elec. Cooperative, Inc.*, 838 F.2d 268, 273 (8th Cir. 1988).

[59]  *Dico, Inc. v. Amoco Oil Co*., 340 F.3d 525, 529 (8th Cir. 2003)

16

business judgment rule presumes that "in making a business decision, the directors of a

corporation acted on an informed basis, in good faith, and in the honest belief that the action

taken was in the best interests of the company."[60]  "Those presumptions can be rebutted if

the plaintiff shows that the directors breached their fiduciary duty of care or of loyalty or

acted in bad faith.  If that is shown, the burden then shifts to the director Defendants to

demonstrate that the challenged act or transaction was entirely fair to the corporation and its

shareholders."[61]  A board is protected by this presumption absent proof of "fraud, bad faith

or self dealing in the usual sense of personal profit or betterment."[62]

The business judgment rule "operates to preclude a court from imposing itself

unreasonably on the business and affairs of a corporation."[63]

> [B]usiness failure is an ever present risk.  The business judgment rule exists
> precisely to ensure that directors and managers acting in good faith may pursue
> risky strategies that seem to promise great profit.  If the mere fact that a
> strategy turned out poorly is in itself sufficient to create an inference that the
> directors who approved it breached their fiduciary duties, the business
> judgment rule will have been denuded of much of its utility.[64]

---

[60]  *Brehm v. Eisner (In re the Walt Disney Co. Derivative Litigation)*, 906 A.2d 27, 52
(Del. 2006) (citation omitted).  Generally, a board of directors owes a "triad" of fiduciary duties
to the corporation: loyalty, due care, and good faith.  *See McMullin v. Beran*, 765 A.2d 910, 917
(Del. 2000).

[61]  *Brehm*, 906 A.2d at 52 (citation omitted).

[62]  *Cede & Co. v. Technicolor Inc.*, 634 A.2d 345, 360 (Del. 1993) (internal quotations
and citations omitted).

[63]  *Id.*

[64]  *Trenwick America Litigation Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 193 (Del.
Ch. 2006), *aff'd,* 931 A.2d 438 (Del. 2007).

Or, as one court has put it, "Delaware law does not hold corporate decision-makers 'liable for a corporate loss from a risky project on the ground that the investment was too risky (foolishly risky! stupidly risky! egregiously risky! – you supply the adverb) . . . [T]his stupefying disjunction between risk and reward for corporate directors threatens undesirable effects."[65]  "[W]hether a judge or jury considering the matter after the fact, believes a decision substantively wrong, or degrees of wrong extending through 'stupid to 'egregious' or 'irrational', provides no ground for director liability, so long as the court determines that the process employed was either rational or employed in *a good faith* effort to advance corporate interests."[66]

In sum, the Trustee contends in her motion for summary judgment that the process employed by the Defendants in proceeding with Dotdeliver was not rational and that, in so proceeding, the Defendant entities, as well as those individuals then serving as directors (which did not include Defendants Pottow and Von Stroh), violated their duty of care to the company.  She also contends that the Defendants did not act in good faith, and that they violated a duty of loyalty to the company by ignoring the interests of the direct sales business in approving and pursuing Dotdeliver, by holding interests in Dotdeliver which were in conflict with that of the direct sales business, and by collecting management fees to the

---

[65] *Official Committee of the Unsecured Creditors of Color Tile, Inc. v. Investcorp S.A.*, 137 F. Supp. 2d 502, 509 (S.D. N.Y. 2001) (*quoting Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1052 (Del. Ch. 1996)).

[66] *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996) (emphasis in original).

18

detriment of the direct sales business.

## VI.  STIPULATED FACTS

For purposes of the pending motions, the parties have stipulated to the following facts

relating to the duty of care and duty of loyalty:[67]

1.      SGCP formed a "deal team" that included Defendants Neenan and Von Stroh.  Lane,

the CEO and President of SGCP, was responsible for reviewing the due diligence on House

of Lloyd.  In September 1999, Neenan contacted Moritz Schlenzig ("Schlenzig"), who then

was employed at a consulting firm called the Mitchell Madison Group ("Mitchell Madison"),

which later became Marchfirst, Inc. ("Marchfirst"). Neenan informed Schlenzig that "it is

SG Capital Partner's vision to create a leading provider with the goal to capture top five

market share of the US market for outsourced back office fulfillment services."

2.      Neenan and SGCP were interested in House of Lloyd's two underutilized warehouses

and the automated picking operation that House of Lloyd developed for their business.

Neenan hired Marchfirst to assess House of Lloyd's logistics operation as a platform for the

envisioned e-fulfillment provider and to provide an evaluation of the direct sales operation

itself.

3.      As part of its due diligence, SGCP also retained Deloitte & Touche, O'Sullivan, Graev

---

[67] The following numbered stipulated facts come from the Joint Statement (*Undisputed Facts for Purposes of Summary Judgment*) (Doc. #199), previously referred to, which was filed by the parties at the Court's directive following the February 8, 2008 hearing on the summary judgment motions.  Although I have renumbered the statements, made some stylistic changes, and omitted a few of the stipulated facts because I considered them to be duplicative or immaterial here, the numbered facts set forth below are essentially verbatim to those found in the Joint Statement - Undisputed Facts at ¶¶ 42-165.

& Karabell, LLP, William M. Mercer, and Investigative Group International.

4.      In a written memorandum dated September 30, 1999 addressed to Neenan (the "Memorandum"), Marchfirst provided its initial assessment of the suitability and business potential of House of Lloyd as an initial business platform to enter the third-party e-fulfillment market. In doing so, Marchfirst was responding to a request made by Neenan.

5.      In the Memorandum, Marchfirst stated that the "target company [House of Lloyd] can serve as an appropriate platform for entering the third-party e-fulfillment market, by providing ample spare capacity in a key fulfillment function, warehousing and logistics." Marchfirst further stated that the "minimum investment required (exclusive of any acquisition-related outlays) will be on the order of $15-20 million over a period of three years.  Investment will be focused on upgrading and web-enabling the warehousing operation (e.g., real time order tracking, real time inventory management, visible delivery schedules, single item order fulfillment, security), developing customer service capabilities, and forming a strong business-to-business consultative sales force."

6.      In a document dated October 9, 1999, Marchfirst provided a written update to its previous assessment (the "Update"). In the Update, the Marchfirst team stated that "we believe Gargoyle [House of Lloyd] makes strategic sense as a platform component for rapid market entry into e-fulfillment."  The Update goes on to say that "in the long run, based upon our knowledge of the subject industries, we believe the business models for e-fulfillment and party sales lack synergies sufficient to warrant a long-run combined operation.  Accordingly, we believe that after the 12-18 month turn-around, Gargoyle's [House of Lloyd] party plan

20

operation should be spun-off of the core e-fulfillment entity." The Update also states that "we believe [House of Lloyd] presents a significant stand-alone turn-around / value-extraction opportunity in its existing party plan business."

7.      Marchfirst advised SGCP that House of Lloyd's systems were "ineffective," "can not scale," were "built by one individual," and that a "[p]roposed [new] system enables direct sales to leverage back-end processes designed for e-fulfillment."

8.      In September 1999, Schlenzig had responsibility for the overall project management and for the deliverables that Mitchell Madison and later Marchfirst was contracted to provide to SGCP.

9.      In October 1999, Neenan and Von Stroh presented a Preliminary Investment Memorandum dated October 4, 1999 to the Merchant Banking Investment Committee of SGCP (the "Investment Proposal"), in which they identified the turnaround in sales as the "most significant risk" to Debtors. In the Investment Proposal, Neenan and Von Stroh described a potential $20 million investment in House of Lloyd and stated that "a significant part of our investment rationale is to acquire a platform to launch an e-fulfillment business." A Final Investment Memorandum dated October 22, 1999 stated, "As noted in the preliminary investment memorandum, the biggest risk in the transaction is the turnaround in sales necessary to create value through the direct sales organization."

10.     The Investment Proposal contemplated an investment by SGCP and the Kier Group. Neenan and Von Stroh noted in the Investment Proposal that "if company performance is significantly below expectations, a trigger mechanism will allow SGCP to assume control

21

of the Board and eliminate most of the Kier Group's approval rights." The document also states that pursuant to an attached term sheet, "we will share significant control (at least initially and while performance is satisfactory) with the Kier Group even though we are providing over 90% of the cash equity."

11.     SGCP Preliminary Investment Memorandum attributes to Marchfirst a projection that "total e-fulfillment spending will grow from $250 million in 1998 to 4.1 billion by 2003 . . . ."

12.     In a Final Investment Memorandum dated October 22, 1999 (the "Final Investment Memorandum"), Neenan informed SGCP's Merchant Banking Investment Committee that he anticipated "operating the direct sales business and e-fulfillment business as separate divisions with a common holding company managed by the Board of Directors. To facilitate this configuration, the acquisition is structured as an asset purchase with the direct sales and fulfillment assets being transferred into separate subsidiaries. After a limited parallel turnaround/ramp-up, we anticipate formally splitting the businesses apart with the direct sales business as a long-term customer of the e-fulfillment business."

13.     Kier invested in HOL to turn around HOL's core direct sales business. Kier also invested in HOL with the expectation that the Company would explore a third party e-fulfillment business.

14.     On or about November 17, 1999, PNC Bank, N.A. ("PNC") and four of the HOL subsidiaries, HOL Properties, HOL Sales, HOL Catalogues and HOL Retail (collectively, the "HOL Subsidiary Borrowers"), entered into a loan agreement pursuant to which PNC

22

established a revolving credit facility with a maximum advance amount of $47.5 million and

provided a $20 million term loan (the "Facility" or "PNC Facility").   Each of HOL

Properties, HOL Sales, HOL Catalogues and HOL Retail was a borrower under the Facility,

and the holding company, HOL Management, guaranteed the Facility.

15.   The PNC Facility was collateralized by all of HOL's receivables, equipment, general

intangibles, inventory, investment property and subsidiary stock, real property, and leasehold

interests of the Company.

16.   HOL's most valued tangible assets, which served as collateral for the Facility, were

the warehouses that had been appraised at $37 million.

17.   Section 1.2 of the Facility provided:

> (a) the business in which the Borrowers are engaged in selling Christmas,
> home furnishing and related items, cookware and kitchenware and related
> items and giftware and decor items utilizing a party plan network sales method
> as well as other marketing channels, including, but not limited to, direct mail
> catalog operations, seasonal and year-round retail stores and outlets and the
> internet (the "Existing Business"); and (b) the development or implementation
> of fulfillment services for third parties, including the fulfillment or tracking of
> customer orders, shipping and delivering for such third parties, now or
> hereafter engaged by Borrower (the "Fulfillment Business").

18.   Section 7.9 of the Facility prohibited HOL from substantially changing the nature of

the business except "in connection with expanding the Fulfillment Business."

19.   PNC met on a regular basis with HOL management and directors and received

detailed written and oral presentations concerning HOL's finances and the progress of its

business plan with respect to the sales and fulfillment sides of the business.

20.   PNC, after receiving HOL's monthly reports and written and oral presentations

explaining all expenditures proposed and undertaken by the Company, did not object to any of the Board's decisions concerning expenditures for either the direct sales or the third party fulfillment sides of the business.

21.      In January 2000, Marchfirst stated that SGCP needed to acquire, build, or source functionality beyond that provided by the House of Lloyd acquisition in order to become a leading player in e-fulfillment services.

22.      Marchfirst recommended that it "host" the warehouse management solution that it was recommending that Debtors purchase.[68]

23.      The e-fulfillment hosting and maintenance incremental ongoing costs were projected to be $161,300 for 2000 and $656,000 for 2001.

24.      Neenan and Kier, on behalf of HOL Management, began to take steps to hire a CEO for HOL's third-party fulfillment venture in early 2000.

25.      From at least 1994 until December 2001, Craig Parkhurst ("Parkhurst") served as either the Director or Vice President of Warehouse Operations for House of Lloyd.

26.      During the spring of 2000, a committee of House of Lloyd employees (the "Yantra Committee"), led by Parkhurst, evaluated the Yantra system. The results of the Yantra Committee's evaluation was set forth in materials presented to HOL Management's Board of Directors at the June 6, 2000 meeting (the "June 6 Board Materials"). The specific

---

[68]  Marchfirst had previously recommended that House of Lloyd purchase a warehouse management software package known as the Yantra System.

recommendations made by the Yantra Committee were to, among other things, "review/postpone signing the agreement for Yantra's pure e-commerce platform; review/postpone the purchase of the Oracle database and Great Plains financial packages; review/postpone engaging Marchfirst in the activities and deliverables outlined in their launch proposal for technology implementation."

27.   The Board had "good communication" with respect to the fulfillment business, "budgets were discussed," and there was a considerable amount of discussion on exactly how dollars would be invested.

28.   Kier was the CEO and in charge of HOL's management during the period leading up to the June 6, 2000 meeting. Kier had "a number of prudent concerns" about "the effective launch of [a third-party fulfillment business]." Kier specifically expressed concern that new management be brought in to run the fulfillment business.

29.   HOL reported to PNC its April 2000 financials near the time the Board approved Dotdeliver:

    a.    HOL had $24 million in cash (37% above budget) as of April 30, 2000;
    b.    HOL had $20.2 million in inventory as of April 30, 2000;
    c.    April sales were $3.3 million versus a budget of $1.6 million;
    d.    Year-to-date revenues as of April 2000 were $15 million versus a budget of $13.4 million;
    e.    Operating expenses in April were 20 percent below plan;
    f.    Cash flow for April was favorable to plan by $1.8 million;
    g.    HOL had a borrowing base under the PNC revolver of $12.5 million as of May 31, 2000; and
    h.    no monies had been drawn down on the revolver.

30.   HOL had budgeted $140 million in sales for 2000, a headcount of 30,802 sales

persons, and $42 million in cash for year end 2000. HOL actually ended up with $36.5 million in cash at year end 2000.

31.     At the June 6, 2000 meeting, the Board discussed a presentation, entitled Presentation to the Board of Directors, House of Lloyd Management, LLC dated June 6, 2000 ("June 6 Board Presentation"), that contained a budget estimating revenues and costs expected in connection with the fulfillment business in 2000 and 2001, and a liquidity analysis projecting the Company's cash cushion.

32.     Neenan recalled receiving and relying upon the June 6 Board Presentation.

33.     The June 6 Board Presentation projected revenues and costs for Dotdeliver as follows:

     a.     For 2000, it was projected that:

          i.     Revenue and gross profit from fulfillment services provided to third parties would be $877,200 and $517,000 respectively.
          ii.     One-time costs relating to technology and other items of infrastructure relating to fulfillment would be approximately $6.3 million and incremental overhead would be approximately $1.2 million.
          iii.     Net cash flow would be approximately negative $7 million.

     b.     For 2001, it was projected that:

          i.     Third party revenue would be $11.5 million.
          ii.     Gross profit would be $6.5 million.
          iii.     Incremental overhead would be $2.8 million.
          iv.     One-time costs would be approximately $2.4 million.
          v.     Net cash flow would be positive $1.3 million.

33.     The June 6 Board Presentation informed HOL Management's Board that to proceed with the e-fulfillment venture would cost an estimated $7,898,900 in 2000 and

an additional $11,171,000 in 2001. Of the $7,898,900, $6,346,800 was estimated for

one time costs.

34.     At its June 6, 2000 meeting, which included appointing Neenan as chairman of

Dotdeliver, HOL Management's Board of Directors unanimously took the following action:

> RESOLVED: that the Company, as Managing Member of
> House of Lloyd Properties, LLC, approves the proposal to
> develop a merchandise distribution and e-fulfillment business
> under the operation of House of Lloyd Properties, LLC and
> further that House of Lloyd Properties, LLC and the Chairman
> and Chief Executive Officer of House of Lloyd Properties, LLC
> be and any of them hereby is authorize and directed to take such
> actions as it, he or they deem necessary to develop such
> business, subject to the direction of the Company and Board of
> Directors of House of Lloyd Properties, LLC.

35.     "Dotdeliver" would be the name of the fulfillment business.

36.     At the time that the Board decided to proceed with Dotdeliver, the board was

comprised of Kier, Lane and Neenan.

37.     There was much Board discussion over hiring the right team to run the fulfillment side

of the business.

38.     In late June 2000, after an extensive search, Mark Knotts ("Knotts") was offered the

position of CEO of the third-party fulfillment business.[69]  Knotts commenced work in or

about August 2000.  Knotts had more than 20 years of extensive "experience in logistics,

transportation, distribution and distribution systems" including having served as the President

---

[69] While the fulfillment business was planned to be operated through HOL Properties,
there is no evidence that that company ever operated separately or even had its own bank
account.

27

of A.M.I.G.O. Logistics and the CEO of Tone Brothers.

39.     In November 2000, Schlenzig, who was on the Marchfirst team conducting the analysis and feasibility of the third-party business, left Marchfirst and became the President and COO of Dotdeliver.  Based on the due diligence he had conducted for Marchfirst, Schlenzig believed Dotdeliver was a "good" and "promising" opportunity.

40.     The fulfillment side of HOL's business continued to fulfill all of the orders placed by the sales side.  Nothing changed in that process from the way the business functioned prior to the acquisition.

41.     In a memorandum dated June 26, 2000, Von Stroh informed Neenan that "Depending on how the expenses of [Dotdeliver] are categorized, the bank agreement may have to be amended to allow for the expenses at [Dotdeliver]."

42.     Kier "was tasked with turning around the sales business until a direct sales industry executive was brought on to run that component of the business." As CEO, Kier "ran the business on a day-to-day basis, ran daily, weekly meetings and a regular schedule for the company . . . ."

43.     The number of working sales representatives had declined from 1997 through 1999, and House of Lloyd's orders per working sales representative had also fallen from 1997 through 1999.

44.     Kier recognized these declining sales trends and had identified strategies to address them, including changes to the compensation system for House of Lloyd's independent sales representatives.

45.    From acquisition through June 2000, Kier ran HOL's sales business and the legacy HOL employees reported to him.  The business plan formulated primarily by Kier was put into effect and several initiatives were accomplished.  For example, by June 2000: responsibilities among departments were reorganized; costs were reduced by, among other things, reducing head count; a company-wide financial control process was implemented; inventory was reduced; performance standards were changed by, among other things, changing the sales and recruiting requirements for supervisors and district managers; and the measure by which sales consultants earned trips to reward performance was changed to be more productive and cost efficient.  The Company also implemented a new structure for the sale of "demonstrator kits" used by consultants when selling products in their homes.  This change was intended to help decrease the seasonality of HOL's business.

46.    After a search by an executive recruiting firm, the Board hired Betty Palm ("Palm") as the President and Chief Operating Officer of HOL Sales in June 2000.  Palm was approved by the Board during the same meeting at which the Board of HOL Management approved expenditures to develop an e-fulfillment business.  One year later, in May 2001, Palm became the CEO of HOL Sales, the direct sales side of the business.

47.    Palm had more than 23 years experience in direct sales.  Palm had served as President of Tupperware Corporation and Vice President of Sales and Marketing of the Longaberger Company.

48.    Prior to joining HOL, Palm had formulated a strategy that included many of the same ideas the consultants had recommended to SGCP and the Board.

29

49.     Palm was attracted to the HOL opportunity because of the "whole notion of contemporizing, updating . . . revitalizing the sales organization, recruiting new people." Palm thought that "there was an opportunity to grow a company here and that there was a committed group of people behind it, and that the investment of $20 million was enough to certainly effect a turnaround situation."

50.     As President and COO of HOL Sales, Palm "reported directly to Joel Kier."

51.     Palm had no role whatsoever in the development of the e-fulfillment business.

52.     In the latter half of 2000, Palm replaced legacy managers in order to strengthen the management team.  Palm hired senior executives and middle level managers.

53.     The Board supported Palm's efforts to strengthen management and gave her the resources she needed to accomplish this.  In 2000, several positions were filled, including President, VP Product Development, VP Marketing, VP Sales, Creative Director, and Controller. HOL continued to strengthen management in 2001.

54.     HOL created a Canadian subsidiary in 2000.

55.     Marchfirst was hired "to do a financial analysis of the new comp plan" and Palm "and other members of the management team" worked with Marchfirst in connection with Marchfirst's analysis.  The Board supported the development of a new compensation plan and approved the new plan in December 2000.  The new plan was announced in January 2001, and HOL started to implement it throughout 2001.

55.     Palm oversaw the design of a new compensation plan approved by the Board in December 2000.  Palm also spearheaded the creation of a re-branding initiative that would

change the name of the direct sales business and re-position the products it sold.

56.    To help reposition HOL's products in the market, HOL Sales hired a marketing consultancy firm called "Just Ask A Woman." The Board approved these expenditures. As part of the rebranding initiative, HOL upgraded the quality of the product line, changed HOL Sales' name to "Open Invitation," and created a new website.

57.    By the end of 2000, HOL had accomplished a number of elements of its business strategy, including: reducing headcount (resulting in an annual savings of $2.1 million); strengthening the management team and middle management ranks; reducing inventory levels; improving the quality of the inventory, developing a re-branding initiative, and developing a new compensation plan to be implemented in 2001.

58.    For the year 2000, HOL had gross sales of $125.2 million and an EBITDA of negative $7.3 million.

59.    In 2001, Palm implemented her proposed strategic changes to improve the profitability of HOL Sales. Those changes included a new compensation plan for the HOL Sales' sales representatives.

63.    Marchfirst filed for bankruptcy on April 12, 2001.

64.    In March, May and June 2001, HOL certified to PNC that the HOL Subsidiary Borrowers were in default under Sections 6.6 (fixed-charge ratio), 7.6 (capital expenditures) and 7.12 (formation of a Canadian Subsidiary) of the PNC Facility. These certifications indicate that Von Stroh was copied.

65.    In Spring 2001, the Board hired GDL Management Services ("GDL") to help

31

"improve the quality of the cash flow forecast," and reduce HOL's expenses.

66.     Although sales were declining, at the end of May 2001 HOL had over $3 million in cash and $16.7 million in inventory, and year-to-date operating expenses were 2.4 percent under budget. The Company had not yet drawn down on its revolver with PNC.

67.     On June 19, 2001, SGC II exercised its rights under the Operating Agreement to declare a Level 2 Trigger Event, which enabled it to appoint Von Stroh and Pottow to the Board. The Management Fee continued to be divided equally between SGC II and Kier Group after the trigger rights were exercised.

68.     On June 21, 2001, after meeting with HOL management, GDL presented the Board with a 15-week cash forecast. That forecast projected that HOL would begin drawing down the revolver in late June 2001 to build its inventory for the Christmas season and HOL would be in a position to begin re-paying the revolver in September 2001. Consistent with that forecast, the Company drew down on its revolver from June 2001 until October 2001 in amounts ranging from approximately $1.8 million to $4.3 million. The revolver was fully paid off in November 2001.

70.     In June 2001, the Board determined "that given the continued challenges being faced at House of Lloyd [Sales] and the execution of its business plan, and given the inability to secure customers at [Dotdeliver], it made sense to scale back the investment and the growth of the [Dotdeliver] initiative."

71.     Pursuant to an agreement, Knotts, Schlenzig and two other Dotdeliver employees agreed to forego six months severance pay in exchange for payment of up to $500,000 in

actual expenses so that they could attempt to obtain from outside sources the funding the Board had denied.

72.    After June 2001, approximately $381,000 in cash was spent in connection with obligations relating to Dotdeliver.

73.    In 2000, approximately $6.3 million in cash was spent in connection with Dotdeliver.

74.    In 2001 (through November 30, 2001), approximately $3 million in cash was spent in connection with Dotdeliver.

75.    Total HOL expenditures, defined to be the total of cost of goods sold, operating expenses and capital expenditures, were approximately $138 million for 2000 and $103 million for the eleventh months ending November 31, 2001.  Total expenditures incurred for Dotdeliver were approximately $6.7 million for 2000 and $4.5 million for the eleven months ending November 30, 2001.

76.    In 2000 and 2001, the expenditures associated with Dotdeliver were at or near the amounts that had been budgeted in June 2000, although no third-party revenues were achieved.

77.    After September 11, 2001, Palm, with the assistance of GDL, implemented further cost cutting measures and other promotional measures in preparation for a weak Christmas season. Palm cancelled excess inventory orders, discounted the product line, and laid off employees.

78.    Neenan was in regular contact with Palm in September and pressed her for a revised budget.  During the September 25, 2001 Board meeting, Palm reported that sales projections

33

were reduced to $117 million because of: (i) the weakness in the economy as a whole; (ii) the disappointing acceptance of HOL's new Spring 2001 product line; (iii) the disruptions in the sales force which had a negative reaction to the proposed changes to the salespersons' compensation plan; (iv) the failure to grow the sales force at the levels that had been budgeted; and (v) "a number of changes in Senior Management, which further hindered the Company's success."

79.    As reported to PNC on September 28, 2001, HOL further reduced its forecasted 2001 sales to be between $108-$122 million.  At this reduced level of sales, cash at year end was projected to be between $16.2 million and $18.9 million.

80.    In October 2001, the Board authorized Neenan to have discussions with the Richmont Corporation ("Richmont") to try to obtain additional financing. Richmont had expertise in the industry and was led by John Rochon, the former Chairman and CEO of Mary Kay, Inc.

81.    In mid-November 2001, Richmont declined to provide any funding.

82.    Throughout the fall of 2001, Neenan and Von Stroh met with three potential investors and lenders in an effort to try to raise financing for HOL. They were unsuccessful in their efforts to bring in new funding.

83.    No management fees were paid by HOL after October 30, 2001.

84.    In November 2001, in the course of preparing a proposed forbearance agreement with PNC, attorneys for HOL Management prepared a list of nine separate categories of default by the HOL Subsidiaries under the PNC Facility, which included the capital expenditure default and the continued payment of the Management Fee.

34

85.     By November 7, 2001, the projected sales were forecasted downward to $95 million from the already adjusted projections presented in September of $108 million.  Even at this level of sales, cash at year end was projected to be approximately $10.1 million. Palm reported that the "entire decline in the current forecast is in the United States Party Plan business," and stated that a much lower percent of consultants were working than had been forecasted, fewer orders were being generated by working consultant per week than forecasted, "the total sales force size during late September and October 2001 decreased from [2000] (11,907 vs. 13,323) as a result of fewer new recruits and fewer seasonal sellers returning in September," and "[r]oughly half of the almost 12,000 consultants in the US field organization have not reactivated their Christmas selling cycle and are disengaged."

86.     On or about December 6, 2001, HOL reported that year-end sales were projected to be approximately $82 million.  This was 50 percent below the original budget of $160 million and represented a 34 percent decrease from the $125 million in sales achieved in 2000.

87.     In December 2001, based on sales of $82 million for 2001, HOL for the first time reported that it would finish the year with no cash and inventory of $11.8 million.

88.     Starting at least as early as July 2001, HOL endeavored to monetize one or both of the warehouses through a sale or sale/lease-back transaction. The Company hired both Cushman & Wakefield and Colliers Turley Martin Tucker to facilitate such a transaction. The proceeds of the transaction would have been used in HOL's direct sales business. Based upon information provided by HOL's real estate brokers, the Board of HOL Management expected

to generate over $30 million from the sale of these assets.

89.     In mid-December 2001, the HOL Management Board was advised that the value of the warehouses, subject to at least three variables, could range from $18 million to $23 million.

90.     Beginning in the Summer of 2001, the HOL Management Board was advised that a simplified organizational structure should be adopted by year end 2001.  In December 2001, the Board approved a reorganized structure of HOL under which each HOL subsidiary, including HOL Properties, became a wholly-owned subsidiary of HOL Sales. HOL Sales remained a subsidiary of HOL Management.

91.     Although authorized at the June 6, 2000 meeting of the Board of House of Lloyd Management, boards of directors were never established for HOL Sales or Dotdeliver.

92.     At a December 21, 2001 Board meeting, Walter Jones of GDL, who had been hired in the spring of 2001 to improve the quality of the cash flow forecast, informed the Board that, due to HOL's deteriorating financial condition and inability to secure merchandise from vendors, the first quarter of 2002 was at risk.

93.     When the Board met on January 3, 2002, GDL indicated that "there were no mature opportunities to consummate an equity transaction and that the Company had insufficient funds to operate beyond January 9, 2002." After extensive discussion, the Board authorized GDL to develop and implement a plan of liquidation.

94.     On January 4, 2002, PNC accelerated its loan. That same day, the Board of HOL Management resolved to file Chapter 11 cases for itself and each of its subsidiaries.

95.    In May 2003, the warehouses owned by HOL were sold for approximately $8.9 million.  Including those funds, PNC has been paid approximately $10 million in the bankruptcy proceeding on its secured claim.

## VII. ANALYSIS

### A. Duty of Care

The first way to rebut the business judgment rule's presumption is to show that the directors breached their duty of care to the corporation.  "The duty of care relates to the process by which fiduciaries make decisions; courts 'do not measure, weigh or quantify directors' judgments.'"[70] Courts do not decide if such judgments are reasonable in this context.[71]  "Due care in the decision making context is *process* due care only."[72]  "It is the essence of the business judgment rule that a court will not apply 20/20 hindsight to second guess a board's decision except in rare cases where a transaction may be so egregious on its face that the board approval cannot meet the test of business judgment."[73]  Such egregiousness must ordinarily be manifested by a grossly negligent process that includes the failure to consider all material facts reasonably available.[74]  "[A]s long as a director's

---

[70] *In re Robotic Vision Sys.,* Inc., 374 B.R. 36, 46 (Bankr. D. N.H. 2007 (*citing Brehm v. Eisner*, 746 A.2d 244, 264 (Del. 2000)).

[71] *Brehm v. Eisner*, 746 A.2d at 264.

[72] *Id.*

[73] *In re Fleming Packaging Corp.*, 351 B.R. 626, 634 (Bankr. C.D. Ill. 2006) (citing *Brehm v. Eisner*, 746 A.2d at 260).

[74] *Id.* (citing *Brehm v. Eisner*, 746 A.2d at 259, 264 n.66).

37

decision is the product of a *process* that was *either* deliberately considered in good faith or was otherwise rational, grounds do not exist to impose liability on a director for breach of the duty of care."[75]

The Trustee contends that the Defendants violated the duty of care both in the due diligence they did in anticipation of approving the Dotdeliver project on June 6, 2000, and in implementing the decision thereafter.

There are several recurring themes in the arguments made by the Trustee in this action. One of them is that the Defendants treated the direct sales business as a step-child, and that they were not sufficiently motivated to preserve that part of the business. However, there can be no doubt that the Defendants had a vested interest in turning the direct sales business around. There can also be no doubt that nothing in the business judgment rule requires that they focus single-mindedly on that task, without at the same time attempting to find a profitable use for the company's expensive, underutilized assets. The fact that the Defendants tried to keep those two balls in the air at the same time does not mean that they violated any fiduciary duties.

Next, the Trustee stresses the fact that, at various times, the Debtors were in violation of loan covenants to PNC. They point to no violations concerning nonpayment, but instead to such items as creating a Canadian subsidiary without bank approval,[76] and covenants

---

[75] *Robotic Vision Sys.* 374 B.R. at 46 (internal quotations and citations omitted, emphasis in original).

[76] Joint Statement - Undisputed Facts ¶ 121.

relating to fixed-charge ratios and capital expenditures.[77]  Apparently, the Trustee is arguing that the Defendants put the company at risk of having its loan called by PNC by proceeding with Dotdeliver in the face of such covenant violations.  However, it is not at all unusual for companies to be in technical violation of loan covenants.  Here, there is no dispute that PNC was provided regular reports as to the status of the companies' operations, and as to its plans. Its own loan documents contemplated starting a venture such as Dotdeliver.  Despite the existence of covenant defaults, PNC continued to allow the companies to take advances on its revolver well into the summer of 2001, more than a year after Dotdeliver was authorized. The fact that there were defaults of this nature, resulting in no adverse consequences, proves nothing.

The Trustee next contends in the Third Amended Complaint that by October 2001, the Defendants knew that HOL was in drastic trouble, but also knew that there was an incentive to see operations through to the end of the year since that was when most of its sales had occurred in the past.  Therefore, the Trustee contends that certain of the Defendants represented to officers and employees of HOL that the Defendants would provide additional funding, if needed, and that the sales agents relied on those representations in continuing to work through the Christmas season, and in spending money for a national convention and merchandise deposits, among other things.  However, under both Delaware and Eighth Circuit law, a trustee does not have standing to bring suit for direct claims belonging to

---

[77]  Joint Statement - Undisputed Facts ¶ 130.

creditors.[78] Instead, such creditors either need to file claims in this Court against the Debtors,

or pursue the Defendants in state court if a theory to do so is available.  For this reason, I

previously dismissed a count of the First Amended Complaint brought by the Trustee on

behalf of such sales agents.[79]  I note that the Trustee has also now moved to dismiss Counts

VII and VIII of the Complaint, which had contended that the Defendants had made some

promise to provide continued funding.

Finally, I note that the Trustee's arguments as to Dotdeliver have shifted somewhat

throughout this litigation.  As stated above, the Complaint contends that the Defendants

"engaged in willful and wanton and/or grossly negligent conduct in approving the decision

to divert millions of dollars and proceeds from the Direct Sales Business which was Debtors'

core business to [Dotdeliver] . . . "[80]  At oral argument, the Trustee's counsel contended that

Dotdeliver might have worked if the Defendants had proceeded more cautiously.  At other

times, the Trustee contends that the problem was that it was anticipated that Dotdeliver

would require an investment of $15-20 million, and the Defendants scuttled it after having

invested only $11.2 million.  The fact that the Trustee seems unable to stick to one of these

arguments helps demonstrate that the Defendants' actions were far from willful, wanton, or

---

[78] *Trenwick America Litigation Trust v. Ernst & Young,* 906 A.2d at 191; *Ozark Rest. Equip. Co., Inc v. Anderson,* 816 F.2d 1222 (8th Cir. 1987).

[79]  Order Granting Defendants' Motion to Dismiss as to Counts III and IV and Denying Defendants' Motion to Dismiss as to Counts I, II, V, VI, VIII, IX, X, XI, and XIII of the First Amended Complaint (Doc. #37).

[80]  Third Amended Complaint at ¶ 79.

even grossly negligent.  Even in retrospect, the Trustee is unable to articulate what exactly the Defendants should have done, and how that would have turned around a company which had been dying a slow death for almost ten years before the Defendants even came upon the scene.  The business judgment rule recognizes that fiduciaries often have difficult decisions to make.  The Trustee's inability to point to just what the Defendants should have done to save the company underscores the difficulty of the choices the Defendants faced.

## 1.  Due Diligence Concerning Dotdeliver

With that backdrop, we turn to the specific arguments raised by the Trustee as to duty of care.  The Trustee contends the Defendants violated their duty of care by draining funds from HOL Sales in order to start Dotdeliver, and that, if those funds had been available, then HOL Sales, and the other entities, would have survived and had funds available with which to pay their creditors.

As seen from the stipulated facts, the contention that the Defendants violated their duty of care is belied first by the testimony of the Trustee's own witness, Betty Palm, who was brought in by the Defendants to run HOL Sales, and who had brought her considerable experience in party plan businesses to bear in creating a strategy to turn HOL Sales around. Ms. Palm testified that she was provided "every resource imaginable" in running HOL Sales.[81]  The investment in HOL Sales did not prevent her from implementing her plan; that plan just didn't work.  The Trustee alleges that the Defendants undertook Dotdeliver without

---

[81] Palm Deposition (Defendants' Supp. Ex. 2.) at 177; Palm Deposition (Defendants' 56.1 Stmt. Ex. 32) at 120.

being prepared and without conducting a "reasonable investigation."[82]  As shown, to rebut the presumption that a director acted with due care, a plaintiff must establish gross negligence, which requires proving that a director was "recklessly uninformed" or acted "outside the bounds of reason" in making a decision.[83]  Because the gross negligence standard imposes an exceptionally high threshold for proving a duty of care violation, however, such violations are "rarely found."[84]  The evidence as to which there is no genuine issue shows that the Board exercised due care by engaging in an appropriate process and approving Dotdeliver only after the culmination of months of due diligence. The process they employed in approving Dotdeliver was rational, and was employed in a good faith effort to advance corporate interests.

In this connection, prior to the acquisition, SGCP:

- Retained Marchfirst who advised, among other things, that the infrastructure at HOL could be leveraged to start a third-party

---

[82] Third Amended Complaint ¶ 79(b).

[83] *Albert v. Alex. Brown Mgmt. Servs., Inc.,* 2005 WL 2130607, at *4 (Del. Ch. Aug. 26, 2005) (citations omitted); *see also Roselink Invs., L.L.C. v. Shenkman,* 386 F. Supp.2d 209, 217 (S.D. N.Y. 2004) (applying Delaware law and stating "under the business judgment rule director liability is predicated on concepts of gross negligence"); *Solash v. Telex Corp.,* 1988 WL 3587, at *9 (Del. Ch. Jan. 19, 1988) (stating that the standard for gross negligence is a high one, requiring proof that the decision was "so grossly off the mark as to amount to 'reckless indifference' or a 'gross abuse of discretion'").

[84] *In re Walt Disney Co. Derivative Litig.,* 907 A.2d 693, 750 (Del. Ch. 2005), *aff'd,* 906 A.2d 27 (Del. 2006); *see also Albert v. Alex. Brown Mgmt. Servs.,* 2005 WL 2130607, at *4 ("Gross negligence has a stringent meaning under Delaware corporate (and partnership) law, one 'which involves a devil-may-care attitude or indifference to duty amounting to recklessness.'") (citing William T. Allen, Jack B. Jacobs and Leo E. Strine, Jr., *Function over Form: A Reassessment of Standards of Review in Delaware Corporation Law,* 56 Bus. Law 1287, 1300 (2001)).

fulfillment business and that HOL could reasonably expect to generate "an annual $64 million in incremental revenue and $17 million in incremental EBITDA from third party fulfillment within a time frame of three years."[85]

- Received advice from Marchfirst that "[t]he ramp-up of the HOL e-fulfillment business will be completed simultaneous to the turn-around of the HOL party plan business. During this period, the businesses will share the benefits of investments that each firm would have been required to make in an independent structure."[86]

- Retained independent consultant Ron Munkittrick, who advised that HOL would be "an excellent low cost-low risk operational platform for SGCP's e-commerce distribution venture."[87]

- Hired Barry Curtis, a partner at Deloitte & Touche, who advised that HOL represented an attractive e-fulfillment platform.[88]

After acquisition, the Board performed an additional six months of analysis, and obtained additional recommendations from the outside consultants.  From November 1999 until the June 6, 2000 Board meeting, Marchfirst advised the Board, among other things, that:

- nationwide fulfillment spending was estimated to grow substantially in

---

[85] Joint Statement of Facts (#199), *Facts Asserted in Defendants' Statement of Uncontroverted Material*[] *Facts and Defendants' Additional Statement of Uncontroverted Material Facts, and the Trustee's Responses* (hereafter "Joint Statement - Defendants' Statement of Facts") ¶ 9 at p. 61; *see also* Defendants' 56.1 Stmt. Ex. 5 at 2.

[86] Joint Statement - Defendants' Statement of Facts ¶ 15 at p. 63; *see also* Defendants' 56.1 Stmt. Ex. 8 at SCH 252.

[87] Joint Statement - Defendants' Statement of Facts ¶ 5 at p. 59-60; *see also* Defendants' 56.1 Stmt. ¶ 27; Defendants' 56.1 Stmt. Ex. 2 at SG 37286.

[88] Joint Statement - Defendants' Statement of Facts ¶ 12 at p. 62; *see also* Defendants' 56.1 Stmt. ¶ 28; Defendants' 56.1 Stmt. Ex. 13 at SG 89231.

four years — from $0.54 billion in 1999 to $4.1 billion in 2003;[89]

- if HOL "moves forward aggressively, it is well positioned to capture the rapidly growing U.S. markets for outsourced e-fulfillment services";[90]

- it had developed a "long and robust" list of prospective fulfillment clients, which Marchfirst was aggressively pursuing and that "as a result of our efforts to date, a long and robust list of prospective [D]otdeliver clients now exist" and that "the opportunity exists to convert two or three of these leads into [D]otdeliver clients in the very near future."[91]

Before approving the third party fulfillment business, the Board reviewed a budget for the costs that would be incurred in connection with that business and engaged in a "considerable amount of discussion on exactly how dollars would be invested."[92]

And based on the dot-com collapse and the resulting failure of Dotdeliver to build a customer base, the Board made an informed decision in 2001 to cease funding the operation.[93]  Specifically, by March 2001, Schlenzig, who was the President and COO of Dotdeliver, and Mark Knotts, its CEO, had concluded that the market for dot-com retailers had collapsed and, therefore, they decided to propose to the Board that they shut down

---

[89] Joint Statement - Defendants' Statement of Facts ¶ 26 at p. 67; *see also* Defendants' 56.1 Stmt. ¶ 71; Defendants' 56.1 Stmt. Ex. 12 at HOL 5033.

[90] Joint Statement - Defendants' Statement of Facts ¶ 27 at p. 67; see also  Defendants' 56.1 Stmt. ¶ 72; Defendants' 56.1 Stmt. Ex. 12 at HOL 5033.

[91] Joint Statement - Defendants' Statement of Facts ¶ 30 at p. 69; Defendants' 56.1 Stmt. ¶ 75; Defendants' 56.1 Stmt. Ex. 11 at SG 99397.

[92] Joint Statement - Undisputed Facts ¶ 93; Defendants' 56.1 Stmt. Ex. 31 (Kier Tr.) at 108.

[93] Joint Statement - Undisputed Facts ¶ 138; Defendants' 56.1 Stmt. ¶ 114-16.

Dotdeliver "to reduce the cash burn of the company."[94]  Kier also testified that the market

changed in 2001 due to a "precipitous slowdown in the e-commerce environment."[95]  Kier

further testified that the Board had engaged in "regular evaluations of the business" and

determined that, given the continued challenges being faced at House of Lloyd, "it made

sense to scale back the investment and growth of the [Dotdeliver] initiative for that particular

period."[96]

The facts as to which there is no genuine dispute show that these directors can in no

way be reasonably said to have failed to perform adequate due diligence.  By contrast, in

*Smith v. Van Gorkom*,[97] directors were found liable after they approved a cash-out merger

on the basis of a twenty-minute oral presentation at a single board meeting. Most of the

directors had no prior knowledge that the merger would be discussed at the meeting;

members of senior management learned of the proposed transaction only an hour before the

meeting; board members were given no documentation concerning the proposed transaction;

and the board chairman's oral presentation was based on his "understanding of the substance

of an agreement which he admittedly had never read" and that the rest of the board had never

seen.[98]

---

[94] Defendants' 56.1 Stmt. Ex. 38 (Schlenzig Tr.) at 150-51.

[95] Defendants' 56.1 Stmt. Ex. 31 (Kier Tr.) at 173.

[96] Defendants' 56.1 Stmt. Ex. 31 (Kier Tr.) at 169-70, 176-77.

[97] 488 A.2d 858 (Del. 1985).

[98] *Id.* at 874.

As noted in a leading treatise, damages have been "imposed upon directors for failure to act on an informed basis" in only a "small number of cases in addition to *Smith v. Van Gorkom*," that "generally have involved directors who failed to pay *any* attention to corporate business."[99] All of them, like *Van Gorkom*, involve directors who utterly abdicated their responsibilities, by either approving major transactions without obtaining or reviewing *any* information, failing to hold or attend meetings, or intentionally misleading or defrauding the company or its regulators as to the true facts.  Nothing remotely like this is even alleged, let alone proven, to have occurred here.[100]

Conversely, where – as here – the board *did* conduct due diligence and *did* meet and debate the issues before reaching a decision, a plaintiff cannot prevail on a duty of care theory.  Thus in *Cincinnati Bell,* the Court granted a summary judgment dismissing the complaint because the defendants had obtained and relied "on the recommendation of

---

[99] Dennis J. Block, Nancy E. Barton & Stephen A. Radin, *The Business Judgment Rule: Fiduciary Duties of Corporate Directors* 167 (5th ed.) (emphasis in original).

[100] *See e.g., Kahn v. Tremont Corp,* 694 A.2d 422, 430 (Del. 1997) (directors "default[ed] on their obligation to remain fully informed" because they failed to attend informational meetings with a special committee's advisors, did not read the advisors' report, did not fully participate in the decision-making process, and prevented the special committee "from acquiring critical knowledge of essential aspects of the purchase"); *In re Robotic Vision Sys., Inc.,* 374 B.R. 36, 51 (Bankr. D. N.H. 2007) (director defendant "prohibited the Board from engaging in any long term or strategic planning," "admitted in e-mails that he deliberately limited the information available to the Board," did not forward outside valuations to the board, and did not disclose the existence of competing bids); *Pereira v. Cogan,* 294 B.R. 449, 528-29 (S. D. N.Y. 2003), *vacated and remanded sub nom. Pereira v. Farace,* 413 F.3d 330 (2nd Cir. 2005) ("the directors clearly abdicated their duties" and demonstrated a "complete lack of any exercise of diligence" with respect to ratifying CEO's compensation because "there is no evidence that the Board met to discuss ratification" or even "knew what level of compensation they were ratifying," and merely relied "on the recommendation of the Compensation Committee," which in turn "had never met" and "did not seek the advice of outside consultants").

qualified outside consultants and implemented the plan to the consultants' satisfaction."[101]

Similarly, in *Tomczak v. Morton Thiokol*, the Court granted summary judgment dismissing

plaintiff's due care claims because the board, before voting to approve the challenged

transaction, attended a two-hour meeting, reviewed the relevant documentation, considered

presentations by outside advisors, discussed the merits of the proposed sale, and also was

aware of management's concerns.[102]  Based on the undisputed evidence, the Defendants here

conducted reasonable investigations prior to both proceeding with Dotdeliver, and later

deciding to terminate such venture.

## 2.  *Failure to Consider Other Factors*

The Trustee nevertheless contends that the decision to proceed was grossly negligent

because the Defendants failed to consider all material facts reasonably available. However,

as a matter of Delaware law, "the amount of information that it is prudent to have before a

decision is made is itself a business judgment of the very type that courts are institutionally

poorly equipped to make."[103]

Nevertheless, I will consider the omissions alleged by the Trustee. First, she points

out that nothing in the reports indicate that the consultants had any special expertise in the

party-plan type direct sale business or in the turnaround of distressed companies.  But, the

---

[101]  *Cincinnati Bell Cellular Sys. Co. v. Ameritech*, 1996 WL 506906 at *18-19 (Del. Ch. 1996).

[102]  *Tomczak v. Morton Thiokol, Inc.*, 1990 WL 42607 at *13-14 (Del. Ch. 1990).

[103]  *In re RJR Nabisco, Inc. Shareholders Litig.* 1989 WL 7036 at *19 (Del. Ch. 1989).

CMT Report recommended that HOL hire a new president or CEO/COO, or both, with experience and a successful direct selling track record.[104]  It also recommended that HOL redesign the product offering to have better year-round purchase appeal and complete the new career and compensation plan development project.[105]  Based on the CMT report and the efforts of Joel Kier and others, the company proceeded to hire Betty Palm, an experienced CEO with expertise in the party-plan direct sales business.  Under her leadership, HOL proceeded to revise its basis for compensating sales agents, and to contemporize and update the direct sales business.  Rather than retaining an outside expert to provide advice, the Defendants hired an expert to run the direct sales side of the business.

Next, the Trustee argues the experts did not conduct any study or provide any meaningful evaluation of whether the launch of a new and separate e-fulfillment business could or should be attempted simultaneously with efforts to revitalize HOL Sales, and failed to examine what financial impact the cost of the new venture would have on the direct sales business.  This argument presumes the direct sales business was starved for capital at the time Dotdeliver was authorized.  The evidence shows, however, that as of April 30, 2000, some 37 days before Dotdeliver was authorized, the company had $24 million in cash, and a borrowing base availability of $12.5 million more.[106]

In addition, the Trustee points out that both Marchfirst and Munkittrick recognized

---

[104]  CMT Report (Trustee's Ex. 61) at 4.

[105]  CMT Report (Trustee's Ex. 61) at 5.

[106]  Joint Statement - Undisputed Facts ¶ 95.

48

that to proceed with the e-fulfillment venture would require additional capital investment. Marchfirst estimated that the minimum investment required (exclusive of any acquisition-related outlays) would be in the magnitude of $15-20 million over a period of three years and that the initial investment ranged somewhere between $3.8 million to $10.3 million. As stated, the Defendants actually did expend $11.2 million on the project before deciding, subsequent to the dot-com collapse, that no further funds should be spent on Dotdeliver.

According to the Trustee, this estimate underestimated the amount of capital which would be required because it did not properly consider the additional losses which it was anticipated would result from the direct sales business in the period prior to its being hopefully turned around. The CMT Report had said that the changes in the direct sales business it proposed would lead to a "significant" drop in sales while the sales force adjusted.[107] However, it did not say how much, and there is no evidence that the Defendants should have anticipated a drop on the order of what actually took place in the Fall of 2001.[108]

In effect, the Trustee here argues that the Defendants should have waited to start Dotdeliver until the direct sales business had been turned around, which CMT had projected would take from 18 months to three years, and should have in the meantime been prepared to devote all their cash and loan availability to supporting that effort. First, the decision as

---

[107]  Trustee's Ex. 61 at 14.

[108]  Indeed, Betty Palm testified that she anticipated that 2001 would be a year of profitable growth because of a new compensation plan, a new marketing campaign based focus, and more of an orientation towards a positioning that was lifestyle-oriented. Palm Deposition (Defendants' 56.1 Stmt. Ex. 32) at 237, 252.

to the timing of when to proceed with a venture, without the benefit of hindsight, is a classic example of business judgment which is left to the discretion of a board of directors.  Here, in approving Dotdeliver, the Board had in front of it a projection that in the year 2000, the net cash flow from that operation would be approximately a negative $7 million, and that in the year 2001 the net cash flow would be a positive $1.3 million.  But the Defendants also had $24 million in cash on hand, inventory of $20.2 million for the direct sales operation, and a borrowing base of $12.5 available on the PNC revolver.  They had budgeted for approximately $42 million in cash on hand at the end of 2000, and in fact ended up with $37.5 million.  The funds expended on Dotdeliver did not prevent Ms. Palm from implementing her plan for the direct sales business.[109]  Furthermore, in considering approval of Dotdeliver in June 2000, the Board did not anticipate that such venture would produce no revenue.  For the years 2000 and 2001, they projected gross revenue from third parties of more than $12.3 million, and gross profit in excess of $7 million.[110]  These projections obviously turned out to be wrong, but the Directors nevertheless had a reasonable basis for concluding that the company would have more than enough liquidity to both move ahead with Ms. Palm's plan to revitalize the sales business, and at the same time give the entire operation some long-term viability by taking advantage of the opportunities they reasonably saw in e-commerce.

---

[109]  Palm Deposition (Defendants' Supp. Ex. 2.) at 177; Palm Deposition (Defendants' 56.1 Stmt. Ex. 32) at 120.

[110] Joint Statement - Undisputed Facts ¶ 99.

The Trustee also asserts that the decision to purchase the Yantra system breached the duty of care because, in making that decision, the Defendants neglected to obtain or consider any study evaluating what technology upgrades were most functionally needed by and financially appropriate for the direct sales business, neglected to consider how expenditures for technology upgrades should be timed to best assist and promote management's efforts to revive the direct sales business, and ignored recommendations of caution which had suggested that they delay expenditures on such system.  In addition, she points out that Marchfirst, who recommended that the Debtors implement the Yantra system, also proposed that the Debtors hire it to host the system.

As shown, the technology system in place at the time of purchase was not at all current.  Moritz Schlenzig, a partner at Marchfirst (who became the President and COO of HOL's fulfillment business), testified that HOL's existing technology was "largely homegrown"and "written in ancient computer languages where the programmers had left or retired where there weren't really good backup sources.[111]  Kier similarly testified that HOL had an "antiquated legacy IT infrastructure that needed to be improved to compete effectively with its peers and its competitors."[112]  Mark Knotts, who became the CEO of the fulfillment business, testified that:

they didn't have a good forecasting model which [a new] system was going to

[111] Joint Statement of Facts (#199), *Facts Not Previously Disputed by the Trustee* (hereafter "Joint Statement - Previously Undisputed Facts") ¶ 1 at p. 30; Defendants' 56.1 Stmt. Ex. 38 (Schlenzig Tr.) at 184.

[112]  Defendants' 56.1 Stmt. Ex. 31 (Kier Tr.) at 20-21, 50.

provide. [The new system] looked at sales history and it also projected out future sales. They didn't have any of that. I think they used a dartboard. And they had no way to really control back orders. And that was very critical to [the] sales organization.[113]

In essence, the Trustee's complaint is not that the Board spent funds on new technology, but that the Board ignored the views of an internal HOL employee committee as to the Yantra software purchase. There is no evidence as to the expertise of this employee committee to make such a recommendation, particularly since those employees had been working in a company whose own technology was antiquated.[114] Nevertheless, the evidence shows that the Board was in fact presented with the Yantra committee's written recommendations, but simply chose not to follow them.

In addition, the Yantra committee's views on the software package was not a recommendation that the Board not proceed with Dotdeliver.[115] Indeed, the Yantra committee was not charged with the task of opining on whether the Board should proceed with Dotdeliver, and it made no such recommendation. To the contrary, everyone, including the Yantra committee, agreed that HOL should spend close to $1 million to "unmothball" the

---

[113] Joint Statement - Previously Undisputed Facts ¶ 2 at p. 31; Defendants' 56.1 Stmt. Ex. 37 (Knotts Tr.) at 147. Note also that Joel Kier testified that in the recent past "the company was under-managed because of some old technology and practices, which represented an opportunity to improve the business through new technology and better management . . ." Defendants' 56.1 Stmt. Ex. 31 (Kier Tr.) at 241.

[114] I note that the CMT Report had stated that one of the threats to the company was that its field leaders will "continue to look backwards to the 'good old days' with processes and systems that are completely out of sync with today's market." Tr. Ex. 61 at 2.

[115] Joint Statement - Undisputed Facts ¶ 92.

fulfillment machinery to be used by Dotdeliver and to have Marchfirst pursue clients for Dotdeliver.[116]

As to Marchfirst, the record contains no evidence that Marchfirst's possible later hosting of the Yantra technology had anything to do with its analysis or recommendation that HOL purchase Yantra, and HOL was under no obligation to later employ Marchfirst to host the software. The Trustee points to nothing to show that Marchfirst's analysis and recommendations were flawed, incomplete, or otherwise compromised, nor is there any evidence that the Yantra system itself was flawed or inappropriate for HOL. Absent any evidence of an actual conflict, there was no evidence that the Defendants breached their duty of care by relying on Marchfirst's recommendations.[117]

In addition, there was no harm to HOL Sales from the Yantra system because it was never connected for use by HOL Sales.[118] The only harm to HOL Sales was that it went another year or so without the technology upgrades that had not been provided for many years prior to the purchase by Defendants.

Finally, the Trustee points out that the Yantra Committee expressed its concern that Dotdeliver was too expensive and risky for a start-up venture that had no customers. But,

---

[116] *See* Trustee Ex. 54 at HOL 6248-49.

[117] *Cincinnati Bell Cellular Sys. Co. v. Ameritech Mobile Phone Serv. of Cincinnati, Inc.*, 1996 WL 506906 at *15 (Del. Ch. 1996) (granting summary judgment dismissing breach of fiduciary claims) (citations and internal quotation marks omitted) *aff'd*, 692 A.2d 411 (Del. 1997).

[118] Joint Statement - Defendants' Statement of Facts (*Trustee's Response*) ¶ 34 at p. 70.

of course, most businesses begin without customers.  It would have been difficult for Dotdeliver to convince customers to come on board without making some investment to demonstrate its ability to perform for them.

## B.  Duty of Loyalty

The second method for rebutting the presumption created by the business judgment rule is to show that the directors breached their duty of loyalty to the corporations.  "[T]he duty of loyalty is transgressed when a corporate fiduciary, whether director, officer, or controlling shareholder, uses his or her corporate office or, in the case of a controlling shareholder, control over corporate machinery, to promote, advance or effectuate a transaction between the corporation and such person (or an entity in which the fiduciary has a substantial economic interest, directly or indirectly) and that transaction is not substantively fair to the corporation."[119]  "Essentially, the duty of loyalty mandates that the best interest of the corporation and its shareholders take precedence over any interest possessed by a director, officer or controlling shareholder . . . ."[120]  The Trustee asserts that the Defendants violated their duty of loyalty because they held conflicting interests, acted in bad faith, and because they collected management fees from HOL.

## 1.  Conflicting Interests

The trustee contends that the Defendants chose to launch Dotdeliver because they had a conflict of interest and thereby were not dedicated to the best interests of HOL Sales.  Once

_____

[119]  *Growe v. Bedard*, 2004 WL 2677216 at *7 (D. Me. 2004) (citation omitted).

[120]  *Id.* (citation omitted).

again, the Trustee argues that there was something insidious about the Defendants' intent to

employ the underutilized assets of HOL to develop a business which they reasonably

believed had good potential.  She says that "[a]lthough such a use of assets may have made

sense in the abstract, especially if the needed capital were provided by the Defendants from

their own substantial investment assets, Defendants were not free to ignore the history of

declining sales and immediate capital needs of HOL Sales in order to launch [Dotdeliver],

a company in which the Defendants admittedly held a material economic interest, using

capital drained from HOL Sales."[121]

The Trustee argues that in deciding to launch Dotdeliver, the Defendants dominated

a board which they prevented from looking independently at the merits of the investment.

She asserts that Lane and Neenan were not independent, because both of them were

employed by one of the Société Générale entities, were obligated to advance the best interests

of their employer and, as members of Defendant SGCP, had a stake in the profitability of that

entity.  But, of course, SGCP is indirectly one of the owners of HOL Management, which is

the holding company for the other Debtors.[122] What was good for HOL Management was

good for SGCP and the other Société Générale entities. Likewise, the failure of the direct

sales operation obviously was not in the best interest of SGCP or any of it partners. As to

Neenan and Lane, there is no evidence that their decision to try to develop a third party

---

[121]  Suggestions in Opposition to Defendants' Joint Reply Suggestions for Summary
Judgment and in Opposition to the Trustee's Motion for Summary Judgment (Doc. #188) at 21-
22.

[122] Joint Statement - Undisputed Facts ¶¶ 3, 5.

fulfillment business was based on "extraneous considerations or influences" rather than on "the corporate merits of the subject before the board."[123]   The mere fact that they were "affiliated with and/or held a financial interest in the SG Entities" does not create a conflict, but instead ensures that they acted in the corporation and shareholders' best interest.[124]   In fact, the Defendants' interests and the Debtors' interests were identical.[125]

Additionally, the Trustee contends Kier's independence was compromised by the fact that a Trigger Event under the Operating Agreement was in existence, giving the Defendants the power at any time to control the Debtors and relegate Kier to minority status in a closely held company.[126]   Given his alternatives, says the Trustee, there is little doubt why Kier voted

---

[123]  *See Robotic*, 374 B.R. at 46.

[124]  *See Goodwin v. Live Entertainment, Inc.*, 1999 WL at 64265 *28 (Del. Ch. 1999) (holding on summary judgment that directors' employment with controlling shareholder was insufficient to show directors were "beholden" to controlling shareholder for purposes of business judgment rule).

[125]  *See Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Investcorp S.A.*, 137 F.Supp.2d 502, 513 (S.D. N.Y. 2001) (granting summary judgment, under Delaware law, dismissing breach of fiduciary duty claims against director defendants who were employed by corporate majority shareholder, holding that "there is no basis for concluding that the business judgment presumption can be rebutted" because plaintiff's duty of loyalty argument was based on the "flawed premise" that the directors' interests and those of the company "were not aligned" but plaintiff "failed to present evidence . . . that this alleged conflict of interest actually existed").

[126]  *See In re Sabine, Inc.*, 2006 WL 1045712 at *6 (Bankr. D. Mass. 2006) ("A director may be considered beholden to another when the allegedly controlling entity has the unilateral power to decide whether the challenged director continues to receive a benefit, financial or otherwise.").

to proceed despite the misgivings he had expressed just days before the board meeting.[127]

The evidence does show that Kier expressed some concerns about the implementation of

Dotdeliver.  However, Kier never testified that these Trigger Rights in any way influenced

his vote in favor of Dotdeliver.  Indeed, since the Trustee agreed not to make him a

Defendant in this lawsuit,[128] Kier has had no incentive to hold back from saying so, but he

has still never so testified.  Instead, he testified several times that the decision to go ahead

with Dotdeliver was thoroughly discussed and cautiously considered by the Board.[129]

Kier testified that he invested in HOL to turn around the direct sales business, but also

with the expectation that the company would explore a third-party e-fulfillment business.

Kier testified that "there were a number of reasons the acquisition [of HOL] presented a[n]

opportunity," including that "the company had significant warehouse capacity" that "had the

potential to be utilized for third-party fulfillment at a time when the market had been growing

rapidly and there was potentially lack of ready capacity in the fulfillment area."[130]  In

---

[127] *See In re Envid, Inc.*, 345 B.R. 426, 448 (Bankr. D. Mass. 2006) (finding lack of
independence, in part, where the defendant "issued numerous serious warnings about the
Company's financial condition and direction and then retreated to a position of silence, or, in
some cases, approval at Board meetings at which the very transactions and strategies he
questioned were effectuated.").

[128] *See* Settlement Agreement and Mutual Releases, Attached as Exhibit 2 to Certificate
of Service Re: Trustee's Motion for Entry of an Order Approving Settlement Agreement and
Mutual Release, in *In re House of Lloyd Sales, LLC., et al.*; Case No. 02-40208 (Bankr. W.D.
Mo.) (Doc. #652).

[129] Defendants' 56.1 Stmt. Ex. 31 (Kier Tr.) at 52-3, 65, 101, 102, 106, 324.

[130] Joint Statement - Previously Undisputed Facts ¶ 4 at p. 32; Defendants' Supp. Ex. 1
(Kier Tr.) at 31.  *See also* Defendants' 56.1 Stmt. Ex. 31 (Kier Tr.) at 21-22.

addition, he testified that the internet "represent[ed] some exciting opportunities to reduce the cost of doing business, reach larger groups of people faster, and was an additional channel of distributions."[131]

The Trustee also points out that the Board of HOL Management was to consist of five members, at least one of them being independent. At the time Dotdeliver was approved, the Board had two vacancies, including the one that would have been filled by someone not associated with House of Lloyd. But the Trustee's underlying assumption is that that person would have convinced the Defendants that Dotdeliver was either a bad idea, or that they should instead invest additional resources in HOL Sales. Ultimately, even with a full board, the Defendants would have been free to proceed because, at the time they chose to invest in the company, they had ensured that they would hold a controlling interest in the board anyway. There is nothing inherently wrong with investors maintaining a controlling interest in a board of the company they own. The issue, then, is whether they used that control to act in the best interests of the someone other than HOL.

The Trustee's argument presumes that there was some conflict between the interests of HOL Sales and Dotdeliver. However, there was no such conflict. From the time of purchase, all the HOL entities were obligated on the debts owed to PNC and the Lloyd Trust. All of the HOL entities were operated out of the same bank accounts. If the Dotdeliver strategy had taken off, the Defendants may have restructured the operation so that HOL Sales

---

[131]  Defendants' 56.1 Stmt. Ex. 31 (Kier Tr.) at 20, 21.

was a customer in the same way that third parties were hoped to be customers of Dotdeliver,

or may even have eventually sold the direct sales operation off.  But that does not mean that

the Defendants and Dotdeliver were acting in conflict with the interests of the HOL Sales.

The Defendants had invested $18 million (plus an additional $2 million from Kier) and had

incurred $67 million in debt. They stood to gain nothing — and to lose everything — if the

core sales business did not prosper, and indeed they did lose their entire investment.[132]

Thus, there is absolutely no evidence that the Defendants  "deliberately ignored the

needs and interests of the direct sales business," as the Trustee alleges.  Her position is

illogical, given that the Defendants are the shareholders of the company who stood to gain

or lose from the success or decline of HOL Sales.[133]  There was no breach of the duty of

loyalty here.

### 2. Bad Faith

The Delaware Supreme Court has held that the "fiduciary duty of loyalty is not limited

to cases involving a financial or other cognizable fiduciary conflict of interest.  It also

encompasses cases where the fiduciary fails to act in good faith."[134]

> A failure to act in good faith may be shown, for instance, where the fiduciary
> intentionally acts with a purpose other than that of advancing the best interests

---

[132] *See, e.g., Trenwick,* 906 A.2d at 173 (the Trustee does not "suggest any plausible motive on the part of the holding company's board to cause the company or its top U.S. subsidiary to become insolvent").

[133] *Accord id*. at 184 ("The complaint's allegations regarding the incentives of the Trenwick directors, frankly make no economic sense.").

[134] *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties.  There may be other examples of bad faith yet to be proven or alleged, but these three are the most salient.[135]

Intentional ignorance of and willful blindness to red flags constitutes bad faith.[136]

The Trustee makes two different arguments which might be characterized as contending that the Defendants acted in bad faith. First, she says that they acted in bad faith in voting to proceed with Dotdeliver, because the projected capital expenditures for that venture were going to put the Debtors in default of their loan covenants under the PNC Facility and the Subordinated Note to the Lloyd Trust.  Both of those documents capped non-financial capital expenditures at $3.5 million. There is a factual dispute between the parties as to whether the Dotdeliver venture violated this provision, and as to whether, and which, of the Defendants would have been aware of such violations. But regardless, the fact that the Defendants proceeded with DotDeliver can hardly be said to be bad faith. As a matter of law, "bad faith involves the conscious doing of a wrong because of dishonest purpose or moral obliquity" and "contemplates a state of mind affirmatively operating with furtive design or ill will."[137]

Here, the covenant violations the Trustee relies on had no effect, and would not

---

[135] *Id.* at 369.  *See also Brehm v. Eisner (In re the Walt Disney Co. Derivative Litig.),* 906 A.2d at 63 (equating a "we don't care about the risks" attitude to bad faith).

[136] *McCall v. Scott*, 250 F.3d 997, 1001 (6th Cir. 2001); *Buckley v. O'Hanlon*, 2007 WL 956947 at *5-6 (D. Del. 2007).

[137] *Robotic*, 374 B.R. at 47 (citation omitted).

reasonably be expected to have had any effect.  While they may have given PNC or the

Lloyd Trust the right to take remedial action, neither did so.  Far from it, PNC, which was

provided monthly information as to Dotdeliver throughout, continued to advance funds

pursuant to the revolver.  As late as the summer and fall of 2001, after HOL's finance

department reported a covenant violation to PNC, it continued to make advances of at least

$8.9 million to enable HOL Sales to purchase inventory needed for the Christmas season.

And, PNC and the Lloyd Trust should have been well aware from the closing documents at

the time of the purchase that the Defendants intended to pursue an e-commerce venture.  It

is not at all surprising that they chose not to exercise their technical rights, given that the

Defendants made no secret to them of their plans to pursue the Dotdeliver venture. Thus, the

decision to authorize Dotdeliver can hardly be said to have been made in bad faith.

The Trustee next contends bad faith because, once the Defendants decided to go ahead

with Dotdeliver, they should have been prepared to spend more monies than they did to see

the project through. She points out that in 1999 Marchfirst had projected that Dotdeliver

would require a minimum investment of $15-20 million over three years,[138] as compared to

the $11.2 million actually spent over two years. This argument assumes that, once they

decided to go ahead with Dotdeliver, they had some sort of obligation to continue, and their

failure to do so was in bad faith. The problem with this argument is that  management of any

company needs to react to changing events; otherwise, they would be obligated to throw

---

[138] Joint Statement - Undisputed Facts ¶ 47.

good money after bad.  Here, the dot-com collapse certainly changed the outlook for

Dotdeliver, since it made it less likely that its potential customers would be able to obtain the

financing needed to go into business. There is no dispute that in the spring of 2001, the Board

hired GDL Management Services to help "improve the quality of the  cash flow forecast,"

and reduce HOL's expenses.[139]   There is also no dispute that in June 2001, the Board

determined "that given the continued challenges being faced at House of Lloyd [Sales] and

the execution of its business plan, and given the inability to secure customers at [Dotdeliver],

it made sense to scale back the investment and the growth of [Dotdeliver] initiative."[140]

Certainly, in terminating Dotdeliver, the Defendants were concluding that that venture

had not worked. But that does not mean that they violated any fiduciary duty in authorizing

it in the first place. And, it certainly does not mean that they acted in bad faith in terminating

it; instead it shows that they continued to carry out their responsibilities, based on the best

and most current information available to them. The fact that they did not continue to devote

resources to a losing venture is certainly not evidence of bad faith.

### 3.      *Payment of Management Fees.*

Pursuant to the Amended and Restated Operating Agreement dated January 31, 2000

between the Kier Group, SG Partners II, and HOL Management, HOL Management was

required to pay Management Fees totaling $400,000 per year, payable in equal monthly

---

[139] Joint Statement - Undisputed Facts ¶ 133.

[140] Joint Statement - Undisputed Facts ¶ 138.

installments to be divided equally between the Kier Group and SG Partners II.[141]  The Kier

Group and SGC II were each to receive $16,666 in monthly management fees.[142]  In the event

that HOL failed to meet specified financial targets, called "Trigger Events," at the end of

1999 and 2000, then the Operating Agreement gave SG Partners II a larger share of the

Management Fee, the right to designate two additional directors, and special voting rights

to holders of Class B Non-Voting Common units.[143]  The Management Fees were also subject

to limitations set forth in HOL Management's financing arrangements with PNC, which

prohibited payment of the Fees if the HOL Subsidiaries were in default under the Facility.[144]

As discussed above, in as early as March 2001, HOL Management certified to PNC

that, as of the last day of December 2000, the HOL Subsidiaries were in default under

Sections 6.6, 7.6 and 7.12 of the PNC Facility.[145]  In addition, on June 19, 2001, SG Capital

Partners exercised its rights under the Operating Agreement to declare a Level 2 Trigger

Event.[146]  Despite the defaults under the Facility and the declaration of the Trigger Event,

HOL Management continued to pay the Management Fee to the Kier Group and SG Partners

---

[141]  Joint Statement - Undisputed Facts ¶ 84.

[142]  *Id.*

[143]  Joint Statement - Undisputed Facts ¶ 86; Trustee's Ex. 48 at SG 39739, 40, 54, 77, and 89.

[144]  Trustee's Ex. 45 ¶ 7.10 at HOL0023484.

[145]  Joint Statement - Undisputed Facts ¶ 129.

[146]  Joint Statement - Undisputed Facts ¶ 135.

I from January through October 2001, in equal amounts, totaling $333,333.20.[147]   SG

Partners I thus received $166,666,66.  Lane, Neenan, Von Stroh, and Pottow each testified

that they were generally aware that the Management Fees were being paid at that time.[148]  In

November 2001, in the course of preparing a proposed forbearance agreement with PNC,

HOL Management's attorneys prepared a list of categories of default by the HOL

Subsidiaries under the PNC Facility, which included the continued payment of the

Management Fee.[149]   At that time, HOL's counsel advised Kevin Murphy, HOL

Management's Vice President of Finance, that continued payment of the Management Fee

would constitute a default under the Facility, as well as a forbearance default under the

proposed forbearance agreement.  Murphy then advised Von Stroh in November 2001 that

the payment of Management Fees was not allowed under the PNC Facility and advised that

he was not going to make the next payment of the Fees without Von Stroh's written

approval.[150]  No management fees were paid by HOL after October 30, 2001.[151]

        According to the Trustee, the Defendants (or their nominees) knew that they were in

---

[147]  Joint Statement - Trustee's Statement of Facts ¶ 32 at p. 54-55; Trustee's Ex. 72 at 11;
Trustee's Ex. 69 at JK504.

[148]  *Id.*; Trustee's Ex. 16 at p. 73 (Lane Tr.); Trustee's Ex. 34 at pp. 214-15 (Neenan Tr.);
Trustee's Ex. 56 at p. 184 (Von Stroh Tr.); and Trustee's Ex. 25 at p. 175 (Pottow Tr.).

[149]  Joint Statement - Defendants' Statement of Facts.¶ 53 at p. 79; Trustee's Ex. 74 at
HOL 30797-98.

[150]  Joint Statement - Defendant's Statement of Facts (*Trustee's Response*) ¶ 53 at p. 79;
Suggestions in Opposition to Defendants' Joint Reply Suggestions for Summary Judgment and
in Opposition to the Trustee's Motion for Summary Judgment (#188) at ¶ 176 at p. 4.

[151]  Joint Statement - Undisputed Facts ¶ 151.

default of the PNC Facility by March 2001, yet they nevertheless continued to allow the payment of over $333,000 in Management Fees until October 31, 2001.  To ignore the constraints of the Operating Agreement and PNC Facility during a time of financial distress demonstrates bad faith as a matter of law, the Trustee says.

The Defendants respond that they did not authorize or otherwise approve the payment of the monthly Management Fees; rather, the payment of the Fees was delegated by management to HOL's finance department.[152]  Further, they say that payment of the fees was, in effect, self-effectuating: in the regular course of business, HOL's finance department paid the Management Fees on a monthly basis; the Board did not vote or otherwise participate in any decision to pay those fees.[153]  And, while Murphy certified that HOL was in violation of certain covenants in 2001, he did not identify payment of the management fees as one of the violations and, in fact, certified that no other event of default had occurred.[154]  The Board members testified that, during that period, they were generally not aware that HOL Management was paying management fees in violation of a loan covenant.[155]  The Trustee

---

[152]  Joint Statement - Undisputed Facts ¶ 85.

[153]  Joint Statement - Trustee's Statement of Facts (*Defendants' Response*) ¶ 32 at p. 55; Defendants' Joint Reply Suggestions in Further Support of their Motion for Summary Judgment and in Opposition to the Trustee's Motion for Summary Judgment (hereafter "Defendants' Supp. 56.1 Stmt.") ¶ 172; Trustee's Ex. 48 at SG 00039763; Lane Aff. ¶ 7; Pottow Aff. ¶ 6.

[154]  Trustee's Exs. 67, 68, 70.  James Roberson, who was CFO for a short period of time, also reported that no Default or Event of Default had occurred, other than those relating to the fixed charge ratio, capital expenditures, and formulation of the Canadian subsidiary already reported.  Trustee's Ex. 71.

[155]  Trustee Supp. Ex. 34 (Neenan Tr.) at 214; Defendants' Resp. Ex. 3 (Neenan Tr.) at 349; Defendants' Resp. Ex. 4 (Lane Tr.) at 245; Defendants' Resp. Ex. 6 (Von Stroh Tr.) at 186;

has offered no evidence to the contrary.

The Trustee now appears to acknowledge that the payment of the Management Fees was self-effectuating in the sense that the Defendants did not specifically authorize each payment, but says that, once the Defendants learned about the improper payments in November 2001, they did nothing to recover the $333,000 that was improperly paid. This is further exacerbated, she says, because half of the money was paid to SG Partners, an entity in which they held, directly or indirectly, a substantial economic interest. She alleges that their failure to recover the unauthorized payments or to reimburse the Debtors for them represents a classic case of self-dealing and breach of the duty of loyalty.

"[D]irectors will not be excused from liability if they either (1) knew about the challenged expenditure yet unreasonably failed to take action; or (2) if they did not know, should have taken steps by which they would have been informed of the challenged expenditure."[156] They may be held to a higher "entire fairness standard" if their inaction was a result of a breach of any of their fiduciary duties.[157]

Here, the payment of management fees does not rise to the level of bad faith or breach of fiduciary duty, given that the Defendants did not authorize or even realize that improper payments were being made at the time, and immediately caused them to stop once learning

---

Defendants' Resp. Ex. 5 (Pottow Tr.) at 183-84.

[156] *Pereira v. Cogan*, 294 B.R. 449, 525-26 (S.D. N.Y. 2003), *rev'd on other grounds*, *Pereira v. Farace*, 413 F.3d 330 (2d Cir. 2005).

[157] *Id.* at 532.

about them.  To succeed on a claim based on oversight, a director must have acted in bad

faith, such as by "intentionally fail[ing] to act in the face of a known duty to act,

demonstrating a conscious disregard for his duties."[158]  The Trustee must establish that

> (a) the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention. In either case, imposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations.[159]

The Trustee has not met this burden here.  For these purposes, I will assume that the Fees

should not have been paid.[160]  However, there was no evidence that the Defendants "utterly

failed" to implement controls, or failed to monitor them.  And, with regard to her assertion

that the Defendants breached their fiduciary duties because they did not actively seek

repayment from Kier and SG Partners, the Trustee has not met her burden there, either,

bearing in mind that "bad faith involves the conscious doing of a wrong because of dishonest

purpose or moral obliquity" and "contemplates a state of mind affirmatively operating with

furtive design or ill will."[161]  Given the relatively small amount of the fees in light of the dire

---

[158]  *Stone*, 911 A.2d at 369.

[159]  *Stone*, 911 A.2d at 370.

[160]  I note that the Trustee settled all potential claims against the Kier Group, including both breach of fiduciary duty and payment of management fee, for $150,000, which is less than the amount of the fees paid to Kier in 2001.  *See* Settlement Agreement and Mutual Releases, Attached as Exhibit 2 to Certificate of Service Re: Trustee's Motion for Entry of an Order Approving Settlement Agreement and Mutual Release (Doc. #652).

[161]  *Robotic*, 374 B.R. at 47 (citation omitted).

financial situation that existed by November 2001 and the filing of the bankruptcy petition

two months later, the undisputed facts demonstrate that the Defendants' conduct did not rise

to that level of wrongdoing.  I will, therefore, grant summary judgment in favor of the

Defendants on Count III of the Complaint.

That being said, although I find that the payment of the fees and the failure to seek

reimbursement of them did not amount to a breach of fiduciary duty, I do not find here that

the Defendants are not responsible for repaying them.  Counts IV, V, IX, X, XI, and XII,

which seek reimbursement of the Management Fees on various other theories, and which are

not part of the pending motions, remain in the case.

## C.  Causation

Finally, even if the Trustee had proven that the decision to launch Dotdeliver or pay

the Management Fees violated the Defendants' duty of care or duty of loyalty, she has failed

to prove that it was the expenditure of funds on Dotdeliver, or the payment of the Fees, that

caused the demise of HOL.  As Delaware's highest court has explained, "the fundamental

principle governing entitlement to compensatory damages [] is that the damages must be

logically and reasonably related to the harm or injury for which compensation is being

awarded."[162]  Where – as here – there is no evidentiary basis to support the causal link

---

[162] *In re J.P. Morgan Chase & Co Shareholder Litig.,* 906 A.2d 766, 773 (Del. 2006)
(affirming dismissal of breach of fiduciary claims). *See also Gunter v. Novopharm USA, Inc.,*
2001 WL 199829 at *12 (N.D. Ill. Feb 28, 2001) (under Delaware law, once breach of fiduciary
duty is shown, "the traditional measure of damages is an award of compensatory damages, the
actual loss caused by [defendant's] wrongful conduct") (citing *Strassburger v. Earley,* 752 A.2d
557, 559 (Del. Ch. 2000)); *Carlson v. Hallinan,* 925 A.2d 506, 540 (Del. Ch. 2006) ("Plaintiffs
claim for breach of fiduciary duties . . . fails, in part, for failure to prove money damages"); *In re*

68

between a wrongful act and alleged damages, summary judgment is warranted.[163]

Recall that in actual (not inflation-adjusted) dollars, sales had dropped from approximately $400 million to $166 million in the decade prior to the acquisition.[164] Recall also that Palm, the direct sales executive brought in to run that part of the business, acknowledged that she had been provided with the support she needed to do so, the investment in Dotdeliver notwithstanding.   Yet the Trustee contends that it was the investment in Dotdeliver, which totaled $11.2 million in the years 2000 and 2001, and which had been contemplated when the Defendants invested $18 million in the HOL companies, and when PNC committed to lend those companies an additional $67.5 million, that caused the liquidation of those companies.

By the time of the bankruptcy filing in January 2002, the company had no cash to continue operations and no access to the PNC line of credit.[165] As has been seen, the company's business was still seasonal, so that it needed to accumulate cash at year-end to get it through the lean times in the first half of the following year.  The Trustee contends that,

--------

*Caremark Int'l, Inc. Derivative Litig.,* 698 A.2d 959, 970 n. 27 (Del. Ch. 19996) (in analyzing derivative breach of fiduciary claims, court notes that "[a]ny action seeking [to] recover for losses would logically entail a judicial determination of proximate cause").

[163] *See Cincinnati Bell Cellular v. Ameritech Mobile Phone,* 1996 WL 506906 at *20 (Del. Ch. 1996) (granting summary judgment dismissing breach of fiduciary duty claims because, among other problems, the damages sought by plaintiff "are not linked specifically to the alleged acts" of the defendants) *aff'd,* 692 A.2d 411 (Del. 1997).

[164] Joint Statement - Undisputed Facts ¶ 31.

[165] Joint Statement - Undisputed Facts ¶ 155, 162.

69

but for the investment in Dotdeliver, the company would have had funds sufficient to operate in 2002.

HOL had three sources of operating funds after the purchase by the Defendants and Kier, those being their original $20 million investment, the net revenues from the direct sales business and, when those were insufficient, draws on the PNC revolving line of credit. Given the disastrous results in the 2001 selling season, there were no funds available from the direct sales business to continue into 2002.  The PNC loan was called on January 4, 2002, thus cutting off that source of funds.  There is no evidence that PNC would have acted differently at that time, particularly since the Dotdeliver investment had long since been concluded, without PNC having called the loan.  The Trustee's expert, Professor Israel Shaked, concludes that "it is reasonable to assume that," but for the loss on Dotdeliver, "the equity owners would in fact have invested $10 million in the company."[166] Yet, of course, nothing in Delaware law obligates a fiduciary to invest additional funds in a company, even if to do so might seem like a good idea to someone else.  There is no evidentiary basis to support Mr. Shaked's contention.

Even if HOL had found funds sufficient to operate in 2002, the Trustee's argument presumes that the sales operation would have been returned to profitability that year, so that the company would have had funds to continue operating in the year after that.  But there is overwhelming evidence that the company was in a long-term decline, the effects of which

---

[166] Rebuttal Expert Report of Professor Israel Shaked dated October 8, 2007 (Doc. #139) at 4.

were much more severe than the Defendants, or Ms. Palm, had anticipated when they became involved. The sales force, which was the source of its revenue, and which had been approximately 60,000 in 1994, had declined to approximately 13,323 in 2000, and had continued to decline in 2001, to 11,907. That continued decline was evident to Palm even before the events of September 11 of that year.[167] Palm testified that there were many reasons for the deterioration of the direct sales business in 2001, including weakness in the economy, disappointing acceptance of the new Spring 2001 product line, disruptions in the sales force resulting from the significant change in the compensation plan and structure, failure to grow the sales force at the planned levels to support the significant increases in planned business, and changes in senior management.[168] And, even if Ms. Palm and her team could have solved all those problems immediately in 2002, they would have been left with a company which was still paying for its underutilized warehouses, and still had an antiquated technology system. In short, the damages claimed by the Trustee, which are based on the demise of HOL, are neither logically nor reasonably related to any harm allegedly caused by the investment in Dotdeliver, or the payment of the Management Fees.

## VII. CONCLUSION

Delaware law encourages entrepreneurs to start new companies, and to try to save existing ones, by limiting the liability of those in control of such companies. The mere fact

---

[167] Palm Deposition (Defendants' 56.1 Stmt. Ex. 32) at 344-45.

[168] Joint Statement - Undisputed Facts ¶ 146; Palm Deposition (Defendants' 56.1 Stmt. Ex. 32) at 528.

that their strategy turns out poorly is not itself sufficient to create an inference that they

breached any fiduciary duties.  Instead, those investors are protected from liability so long

as the process employed was either rational or employed in a good faith effort to advance

corporate interests.  Since the Trustee has failed to prove otherwise, and has failed to prove

that the investment in Dotdeliver resulted in the demise of HOL, the motion of Defendants

for summary judgment on Counts I, II, and III will be granted by separate order.

/s/ Arthur B. Federman
Bankruptcy Judge

Date: 4/8/2008